UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WASHTENAW COUNTY EMPLOYEES )
RETIREMENT SYSTEM, and )
MICHAEL COURTNEY, Individually )
and on Behalf of All Other )
Persons Similarly Situated, )
                              )
          Plaintiffs, )
                              )          CIVIL ACTION
     v.                       )          NO. 13-10686-WGY
                              )
AVID TECHNOLOGY, INC., )
GARY G. GREENFIELD, KENNETH A. )
SEXTON, LOUIS HERNANDEZ, and )
ERNST & YOUNG LLP, )
                              )
          Defendants. )
                              )

YOUNG, D.J.                                    June 27, 2014

## MEMORANDUM AND ORDER

## I.    **INTRODUCTION**

This is a putative class action filed by Michael Courtney
("Courtney") and Washtenaw County Employees Retirement System
("Washtenaw") (collectively, the "Plaintiffs") against Avid
Technology, Inc. ("Avid," or the "Company"), certain of its
officers (the "Individual Defendants") (collectively with Avid,
the "Avid Defendants"), and Ernst & Young LLP ("Ernst & Young")
(collectively with the Avid Defendants, the "Defendants"),
seeking remedies for violations of the federal securities laws

1

pursuant to the Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78a-78pp) (the "Exchange Act"). This securities class action is brought by the Plaintiffs on behalf of purchasers of Avid common stock on the NASDAQ Stock Market ("NASDAQ") between October 23, 2008, and March 20, 2013, inclusive (the "Class Period").

The Plaintiffs' core contention is that the Defendants took actions to present false and misleading financial statements, which artificially inflated Avid's stock price. Those actions involved the knowing violation of established accounting principles, the manipulation of accounting reserves, and the withholding of true and essential information regarding the Company's business. As a result, when the truth was revealed to the market, Avid's stock price plummeted.

The present lawsuit is the result of a consolidation of two class actions separately filed by the two Plaintiffs. After the consolidation, the Defendants moved to dismiss the lawsuit under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), attacking the legal sufficiency of the complaint in light of the heightened pleading requirements under the Private Securities Litigation Reform Act, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.) (the "Reform Act"), and under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). At a motion session held on February 11, 2014,

this Court allowed the motion to dismiss as to the claims of fraud related to the restructuring of the Company and also those related to the European sales operation, and took under advisement the fraud claim pertaining to post-contractual customer support.

## A. Procedural Posture

Courtney filed a complaint in this Court on March 25, 2013. Class Action Compl., ECF No. 1. On May 24, 2013, Washtenaw, which had filed a related lawsuit, also in this session of the Court, moved to consolidate these cases, appoint a lead plaintiff, and approve the selection of counsel. Washtenaw Cnty. Emps.' Retirement Sys.'s Mot. Consolidation, Appointment Lead Pl. & Approval Selection Counsel, ECF No. 6. On June 11, 2013, this Court allowed the motion to consolidate and set for hearing the motion to appoint lead counsel. Elec. Order, June 11, 2013, ECF No. 18. At a motion hearing held on July 31, 2013, this Court allowed the stipulation of the parties as to lead counsel and granted the Plaintiffs forty-five days to file a joint complaint. Elec. Clerk's Notes, July 31, 2013, ECF No. 25. The joint amended complaint was filed on September 16, 2013. Am. Compl., ECF No. 26.

On October 31, 2013, the Avid Defendants filed a motion to dismiss accompanied by a supporting memorandum of law. Defs. Avid Tech., Inc., Louis Hernandez, Gary G. Greenfield, & Kenneth

A. Sexton's Mot. Dismiss Pls.' Am. Compl., ECF No. 33; Mem. Law
Supp. Defs. Avid Tech., Inc., Louis Hernandez, Gary G.
Greenfield, & Kenneth A. Sexton's Mot. Dismiss Pls.' Am. Compl.
("Avid's Mem."), ECF No. 34. On the same day, Ernst & Young
also filed a motion to dismiss along a supporting memorandum of
law. Ernst & Young LLP's Mot. Dismiss, ECF No. 36; Mem. Supp.
Ernst & Young LLP's Mot. Dismiss ("Ernst & Young's Mem."), ECF
No. 37. On December 16, 2013, the Plaintiffs opposed both
motions to dismiss. Lead Pls.' Mem. Law Opp'n Avid Defs.' Mot.
Dismiss ("Pls.' Opp'n Avid"), ECF No. 44; Lead Pls.' Mem. Law
Opp'n Def. Ernst & Young LLP's Mot. Dismiss ("Pls.' Opp'n Ernst
& Young"), ECF No. 46. The Defendants filed their reply briefs
on January 22, 2014. Reply Mem. Law Further Supp. Defs. Avid
Tech., Inc., Louis Hernandez, Gary G. Greenfield, & Kenneth A.
Sexton's Mot. Dismiss Pls.' Am. Compl. ("Avid's Reply"), ECF No.
50; Ernst & Young LLP's Reply Br. Supp. Mot. Dismiss ("Ernst &
Young's Reply"), ECF No. 51.

At the motion hearing on February 11, 2014, the Court
allowed the motion to dismiss as to the claims of fraud related
to the Company restructuring and also as to the European sales
operation, while taking under advisement the fraud claim
pertaining to post-contractual customer support. See Hr'g Tr.
18:12-22, Feb. 11, 2014, ECF No. 57.

## B. **Facts Alleged[1]**

### 1. Parties

The Plaintiffs purchased Avid's securities at purportedly artificially inflated prices during the Class Period, and they were then damaged because of the price drop after the Company announced the corrective measures. Am. Compl. ¶ 14.

Avid is a Delaware corporation with its principal place of business in Burlington, Massachusetts. Id. ¶ 15. Avid is a leading provider of software systems and hardware products used to create and manipulate digital media content. Id. ¶¶ 2, 22. Its products are used by professionals to produce feature films, television programming, live performances, and recorded music. Avid's Mem. 2. Avid's common stock trades on NASDAQ. Am. Compl. ¶ 15.

Gary G. Greenfield ("Greenfield") was Avid's Chief Executive Officer ("CEO"), President, and Chairman of the Board during almost the entire Class Period, having resigned on February 11, 2013, just over a month before the end of the Class Period. See id. ¶ 16. Kenneth A. Sexton ("Sexton") was Avid's Chief Financial Officer ("CFO"), Executive Vice President, and

---

[1] Considering the heightened pleading requirements in securities fraud cases, it is necessary to describe the facts that the Plaintiffs alleged in the amended complaint in greater detail than would normally be required in a motion to dismiss. Also, because this is a motion to dismiss, the Court takes the facts alleged by the Plaintiffs as true. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

5

Chief Accounting Officer throughout the entire Class Period. Id. ¶ 17. Louis Hernandez ("Hernandez") is the current President and CEO of Avid, and was appointed immediately after Greenfield's resignation. Id. ¶ 114.

Ernst & Young served as Avid's independent registered public accounting firm throughout the Class Period. Id. ¶ 21. Accordingly, "[Ernst & Young] audited and issued unqualified audit opinions on Avid's financial statements and its system of internal controls over financial reporting for the years [2008 through 2011]." Id.

## 2. Avid's Purported Fraudulent Schemes

The Plaintiffs generally allege that "[t]hroughout the Class Period, [the] Defendants engaged in a wide ranging scheme to materially inflate [Avid's] reported financial statements." Id. ¶ 3. More specifically, the Plaintiffs identify three instances where the fraud took place: (1) Avid recognized revenues generated from software updates "immediately upon the commencement of a licensing agreement with a customer, as opposed to ratably over the term of the contract" – the manner provided by the Generally Accepted Accounting Principles ("GAAP"). Id. ¶ 4. As a result of this accounting tweak, the Company's results were artificially inflated, which were reflected in the stock price, see id.; (2) Avid "manipulated accounting reserves associated with the four restructuring

6

initiatives during the Class Period in order to inflate its earnings, and by extension the stock price," id. ¶ 5 (emphasis omitted); (3) After touting Avid's increasing operating efficiency for many quarterly reports, the Company finally disclosed "that its centralized sales structure in Europe was failing and that its scheme to increase prices in order to offset lost sales was equally ineffective." Id. ¶ 7. As a result of the disclosure, Avid's stock price plummeted. Id. The Plaintiffs further claim that, "during the Class Period, the Individual Defendants engaged in insider trading, improperly benefiting from their financial shenanigans and Avid's artificially inflated stock price, by selling shares of Avid common stock." Id. ¶ 20.

According to the Plaintiffs, the first two events could only have taken place with the "cooperation and imprimatur" of Ernst & Young, who ignored "fundamental accounting principle[s]" and allowed the fraud to occur. Id. ¶ 6. To better understand the issues involved, the Court breaks down the three fraudulent schemes alleged by the Plaintiffs.

### a. Improper Recognition of Revenue from Post-Contract Customer Support

The first -- and strongest -- allegation by the Plaintiffs regards Avid's accounting treatment of the revenue originated by post-contract customer support ("PCS"). Before going over the

Plaintiffs' arguments, a brief overview of PCS and its
accounting treatment is in order.

"PCS is the right to receive services or unspecified
product upgrades or enhancements offered to users or resellers,
after the software license begins, or after another time as
provided for by the post-contract customer support arrangement."
Id. ¶ 25. The purveyance of PCS is a common practice in the
software business: besides delivering the software, the
producers "provide their customers with other elements such as
additional software products, training, installation,
consulting, telephone support, and future upgrades or
enhancements after the delivery of the initial software." Id.
Importantly, "[b]ecause PCS is considered a separate element in
a software arrangement," GAAP precludes the recognition of PCS
revenue upon the immediate delivery of the software, and
"requires that companies record PCS revenue ratably in financial
statements over the term of the contract." Id.

The Court makes two distinctions at this point. First,
PCS-type services (or "upgrades") are distinct from mere "bug
fixes." While the former constitute some sort of enhancement to
the product,[2] the latter merely fix some coding defect or error.

---

[2] According to the Accounting Standards Codification, an
upgrade is "[a]n improvement to an existing product that is
intended to extend the life or improve significantly the
marketability of the original product through added

8

Avid's Mem. 2. As a result, for accounting purposes, there is a substantial difference between PCS and bug fixes: under GAAP, revenue on software sold without PCS -- i.e., with only "bug fixes" supplied after the sale -- is recognized fully upon the sale. See id. at 2-3. Conversely, revenue from software sold with PCS -- i.e., with enhancements available in the future -- is recognized ratably over the life of the period in which the support is offered. See Accounting Standards Codification ("ASC") 985-605-25-10[3]; Avid's Mem. 2-3. In addition, a "pattern[] of regularly providing . . . certain kinds of customers with . . . unspecified upgrades or enhancements" can result in "implied [PCS]," ASC 985-605-25-66, that also triggers ratable revenue recognition over the "implied" support period.

    The second distinction regards the accounting of the so-called "multiple element arrangements," where both software and PCS are provided pursuant to separate contractual components.[4]

---

functionality, enhanced performance, or both. The terms upgrade and enhancement are used interchangeably to describe improvements to software products . . . ." Accounting Standards Codification 985-605-20.

[3] The accounting rules which compose GAAP are published by the Financial Accounting Standards Board, and are available at https://asc.fasb.org.

[4] "Software arrangements may provide licenses for multiple software deliverables (for example, software products, upgrades or enhancements, postcontract customer support, or services), which are termed multiple elements." ACS 985-605-25-5, available at https://asc.fasb.org.

In such cases, the various elements of the contract must be allocated according to GAAP's revenue recognition criteria. See generally ASC 985-605-25-5 to 25-11. For instance, while the software sale and delivery are accounted immediately, the PCS element must be accounted ratably over the term of the contract. See Am. Compl. ¶ 27. The value assessment of each element is "based on vendor subjective objective evidence of fair value." Id. Accordingly, "the fair value of the PCS [is] determined by reference to the price the customer would be required to pay when it is sold separately." Id. If, however, the company is unable to determine the value of the separate elements of the arrangement and the only undelivered element is PCS, revenues for the entire licensing arrangement should be recognized ratably, and not up front. See ASC 905-685-25-70.

According to the Plaintiffs, during the entire Class Period, Avid sold software that included explicit or implied promises to provide software updates, which the Plaintiffs argue was a type of PCS. See Am. Compl. ¶ 24. Accordingly, each and every Avid Annual Report on Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC") since at least 2008 stated that the Company complies with GAAP by deferring the fair value of PCS and recognizing the related revenue ratably over the span of the service period. Id. ¶¶ 26-30.

On February 25, 2013, however, based on an internal review of its accounting practices, Avid announced that it would delay the release of its fourth quarter and fiscal year 2012 financial results because "it needed additional time 'to evaluate its current and historical accounting treatment related to bug fixes, upgrades and enhancements to certain products which the Company has provided to certain customers.'" Id. ¶ 116 (quoting Avid Tech. 8-K, issued Feb. 25, 2013).

Subsequently, on March 19, 2013, Avid announced its intent to restate previous financial statements based on its failure "'to recognize [revenues] ratably over the estimated PCS service period.'" Pls.' Opp'n Avid 4 (alteration in the original). The failure was related to implied PCS that should have been accounted ratably but was instead accounted up front. Am. Compl. ¶ 124 ("The Company expects that the timing of revenue recognition for the impacted customer arrangements will change from the historical presentation in the Company's financial statements pursuant to which revenue was recognized up front, generally to being recognized ratably over the estimated implied PCS service period.") (quoting Avid Tech. 8-K, issued May 17, 2013). According to Avid's disclosure, "the 'primary focus' of the Company's still ongoing review of its accounting treatment for Software Upgrades 'ha[d] been to determine whether no-charge bug fixes previously made available by the Company to its

customers included upgrades or enhancements and if so, whether such upgrades or enhancements met the definition of [PCS] under [GAAP]'". Id. ¶ 141 (first alteration in the original) (quoting Avid Tech. NT 10-K, issued Mar. 19, 2013).

The Plaintiffs allege that the price of Avid's stock dropped as a result of these disclosures. Id. ¶¶ 140-42, 144.

## b. **Manipulation of Restructuring Expenses**

The second fraud alleged by the Plaintiffs regards the manipulation of expenses incurred with Avid's restructuring. Between 2008 and 2012, the Company went through four restructuring initiatives. Id. ¶ 35. For each of these initiatives, the company recorded restructuring charges in its quarterly and annual forms. Id.

In 2012, however, Avid announced in its first quarter Form 10-Q that it had identified errors in previous financial statements. Id. ¶¶ 36, 100. Through the revised financial statements:

[T]he Company increased its 2011 net restructuring costs by $1.3 million (or 14.7%) and reduced its 2010 net restructuring costs by $1.6 million (or 7.7%). The Company increased its first quarter 2011 net recovery of previously expensed restructuring costs by $740,000 (or 33.4%), reduced its second quarter 2011 net recovery of previously expensed restructuring costs by $325,000 (or 199.4%) and increased its fourth quarter 2011 net restructuring costs by $240,000 (or 2.8%).

Id. ¶ 37 (citing Avid Tech. 10-Q, issued May 10, 2012).
According to the Plaintiffs, Avid's stock price immediately
dropped as a result of this announcement, and "continued to drop
precipitously for several days thereafter on heavy trading
volume." Id. ¶ 101. Likewise, on May 21, 2013, Avid disclosed
it had overstated restructuring expenses related to the second
and third quarters of 2012. Id. ¶ 124.

The Plaintiffs claim that the Avid Defendants "used the
above restructuring accounting shenanigans to manipulate the
Company's earnings by setting up excess reserves in prior
periods and then releasing the reserves into earnings in
subsequent periods, creating phantom income." Id. ¶ 38.

### c. Decline in European Sales Resulting in Restructuring Charges

The third instance of fraud alleged by the Plaintiffs
regards the changes made to the European operation of the
Company. According to the Plaintiffs, for some period of time
since 2008, the Avid Defendants "touted the Company's increasing
operating efficiency with respect to its sales force . . . ,
increasing sales revenues, and positive company-wide growth in
the prior reporting periods." Id. ¶ 43. On July 21, 2011,
however, the Avid Defendants "disclosed that the Company badly
missed sales revenues targets they had led investors to expect,
revealing for the first time that significant deficiencies in

13

the structure of Avid's European sales force required a restructuring of the entire division." Id. ¶ 41. The disclosure immediately caused a sharp drop in Avid stock price, which traded in unusually high volume the following day. Id. ¶ 87. The Plaintiffs allege that the Avid Defendants made misstatements promoting the Company's efficiency while knowing their falsity as to the European operation. See id. ¶ 7.

## II.   ANALYSIS

### A. Jurisdiction and Venue

This Court has jurisdiction under 28 U.S.C. § 1331, and under Section 27 of the Exchange Act, codified at 15 U.S.C. § 78aa, as the claims in this action arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and Rule 10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. The Plaintiffs have adequately alleged that Avid made use of the means and instrumentalities of interstate commerce in committing the acts of which the Plaintiffs complain. Venue is proper under 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).

### B. Standard of Review - Generally

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient to state a facially plausible claim for relief. See Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007) (setting out the standard of review for Rule 12(b)(6) motions to dismiss). Nevertheless, a defendant's burden of persuasion "is a heavy one when a motion to dismiss is filed." Stein v. Smith, 270 F. Supp. 2d 157, 164 (D. Mass. 2003) (Lindsay, J.). In its consideration of a motion to dismiss, the Court is instructed to "accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiffs." Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009). In other words, a motion to dismiss does not measure the complaint's probability of success, but rather its legal adequacy. Reisman v. KPMG Peat Marwick LLP, 965 F. Supp. 165, 170 (D. Mass. 1997).

## C. **Pleading Standards – Securities Action**

"To state a claim under Rule 10b-5, 'a plaintiff must allege that: (1) in connection with the purchase or sale of securities, (2) the defendant made a false statement or omitted a material fact, (3) with the requisite scienter, and that (4) plaintiff relied on the statement or omission, (5) with resultant injury.'" Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 12 (D. Mass. 2004) (quoting In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 52 (D. Mass. 1998) (Lasker, J.)). The dispute in the present motions revolves around the second and third requirements. A brief overview is in order.

## 1. **Misrepresentation or Omission of a Material Fact**

In order to qualify as a material misrepresentation or
omission, the plaintiff must indicate that a reasonable investor
would have viewed the information as "having significantly
altered the total mix of information made available." Basic
Inc. v. Levinson, 485 U.S. 224, 232 (1988) (quoting TSC Indus.,
Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)) (internal
quotation marks omitted).

Rule 9(b) provides that "[i]n alleging fraud . . . a party
must state with particularity the circumstances constituting
fraud." Fed. R. Civ. P. 9(b). It has long been established
that "[t]he First Circuit is 'especially strict in demanding
adherence to Rule 9(b) in the securities context.'" Crowell,
343 F. Supp. 2d at 12 (quoting Gross v. Summa Four, Inc., 93
F.3d 987, 991 (1st Cir. 1996)).[5] Thus, it is the plaintiff's
duty to point to "specific facts that make it reasonable to
believe that the defendant knew a statement was materially false
or misleading. The rule requires that the particular times,
dates, places, or other details of the alleged fraudulent
involvement of the actors be alleged." Id. (quoting Gross, 93
F.3d at 991). In other words, "[t]o survive a motion to
dismiss, a complaint alleging fraud must specify (1) the

---

[5] As this Court observed in Crowell, Gross has been
partially superseded on other grounds by the Reform Act.
Crowell, 343 F. Supp. 2d at 12 n.6.

16

statements that the plaintiff contends were fraudulent; (2) the identity of the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent." Fitzer v. Sec. Dynamics Techs., Inc., 119 F. Supp. 2d 12, 18 (D. Mass. 2000).

Accordingly, "[p]leadings based on information and belief, without specifying the source of the information and the reasons for the belief, do not pass muster under the First Circuit's interpretation of Rule 9(b)." Id.; see also Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991), superseded by statute on other grounds, Reform Act. Finally, the allegations must create a strong inference of fraudulent intent, rather than a reasonable one. Crowell, 343 F. Supp. 2d at 12-13. As a result, "exaggerated, vague, or loosely optimistic statements about a company are not actionable under Rule 10b-5." In re Boston Tech., 8 F. Supp. 2d at 54.

## 2. **Scienter**

As for scienter, "the plaintiff must plead a mental state embracing [an] intent to deceive, manipulate, or defraud. Scienter can be proved by showing either knowledge that the statements at issue were materially false or misleading, or recklessness in that regard, and the complaint must so plead." Lenartz v. Am. Superconductor Corp., 879 F. Supp. 2d 167, 181 (D. Mass. 2012) (alteration in original) (internal quotations

and citations omitted). The First Circuit has long followed the
Seventh Circuit's narrow definition of recklessness: "the
definition of 'reckless behavior' should not be a liberal one
lest any discernible distinction between 'scienter' and
'negligence' be obliterated for these purposes. We believe
'reckless' in these circumstances comes closer to being a lesser
form of intent than merely a greater degree of ordinary
negligence. We perceive it to be not just a difference in
degree, but also in kind." Sanders v. John Nuveen & Co., Inc.,
554 F.2d 790, 793 (7th Cir. 1977); see also Greebel v. FTP
Software, Inc., 194 F.3d 185, 199 (1st Cir. 1999) (quoting with
approval the standard set by the Seventh Circuit in Sanders and
noting that "[the First Circuit] explicitly rejected a
formulation of recklessness as mere negligence, finding it had
to come closer to being a lesser form of intent than merely a
greater degree of ordinary negligence").

    Accordingly, the First Circuit requires:

    A highly unreasonable omission, involving not merely
    simple, or even inexcusable, negligence, but an
    extreme departure from the standards of ordinary care,
    and which presents a danger of misleading buyers or
    sellers that is either known to the defendant or is so
    obvious the actor must have been aware of it.

Greebel, 194 F.3d at 198 (quoting Sundstrand Corp. v. Sun Chem.
Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)). Finally, "[i]n
making the scienter determination, courts consider the totality

18

of the circumstances, rather than examining each alleged

omission or misstatement in isolation." Crowell, 343 F. Supp.

2d at 13.

## D. **The Merits**

### 1. **The Amended Complaint Alleges a Misstatement with Particularity, only as to the PCS-related Claim**

The Avid Defendants assert that the Plaintiffs have failed

to allege a misstatement with the particularity required by the

Reform Act and Rule 9(b) as to all the three purported instances

of fraud. Avid's Mem. 8.

#### a. **The Improper Recognition of PCS Revenue**

As to the first episode of fraud –- concerning the improper

recognition of PCS revenue –- the Avid Defendants claim that

"[t]he pleading simply quotes the revenue reports, labels them

wrong, and emphasizes Avid's accounting policy to recognize

revenue for explicit PCS ratably and consistent with GAAP's

guidance," id. at 9, and as such the complaint "fail[s] to

demonstrate any misstatement . . . with the specificity for

accounting fraud required by the [Reform Act]," id. at 10.

At its core, the Avid Defendants' contention is that the

Plaintiffs make a broad allegation of accounting fraud, without

pointing to any specific transactions that should be accounted

for in a different manner. In other words, the amended

complaint arguably relies solely on Avid's own disclosure of

errors, instead of identifying the particular transactions where the purported fraud actually took place. As the Avid Defendants put it:

> [T]he Amended Complaint provides no detail at all about any update, much less any decision to characterize an update as a mere "bug fix" or an actual "upgrade" that may have constituted implied PCS. There is not one fact identifying any software release where Avid misapplied its accounting policy. The Amended Complaint does not mention any release characterized as a "bug fix" that should have been labeled an "upgrade" or point to "significant . . . added functionality or performance enhancements[]" for any release. And it does not even address the decision making process used to determine how to treat any "update" for accounting purposes.

Id. at 10 (alterations in original) (emphasis omitted).

The Plaintiffs, on the other hand, insist that "the Complaint particularizes the Avid Defendants' materially false and misleading statements and omissions related to the Company's accounting practices regarding implied PCS by specifically identifying: 'what' statements are alleged to be false and misleading; 'who' made the statements . . . ; 'when' they were made; and 'where' they were made . . . . Further, the Complaint also explains 'why' the Avid Defendants' statements were materially false and misleading." Pls.' Opp'n Avid 9 (internal citations omitted).

The parties rely on different lines of cases to support their arguments, and they disagree about what constitutes a sufficiently particularized misstatement pleading.

20

The Avid Defendants rely on this Court's decisions in

Fitzer, 119 F. Supp. 2d 12, and in Orton v. Parametric

Technology Corp., 344 F. Supp. 2d 290 (D. Mass. 2004), where

this Court ruled that the plaintiffs' pleading failed on the

particularity requirement. As observed in Fitzer:

> This Court has previously required significant specificity when a securities fraud claim is based on improper revenue recognition. "To adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions."

Fitzer, 119 F. Supp. 2d at 35 (quoting Lirette v. Shiva Corp.,

27 F. Supp. 2d 268, 277 (D. Mass. 1998)); see also Orton, 344 F.

Supp. 2d at 304-05.

On the other hand, as this Court has also observed, "the

rigorous standards for pleading securities fraud do not require

a plaintiff to plead evidence." Crowell, 343 F. Supp. 2d at 21

(quoting In re Cabletron Sys., Inc., 311 F.3d 11, 33 (1st Cir.

2002)). In Crowell, this Court relied on the First Circuit's

decision in Cabletron, "which makes clear that the question

whether a complaint satisfies the [Reform Act] is fact-specific,

and that not every question regarding relevant transactions must

be answered at the pleading stage." Id. at 21 (citing

Cabletron, 311 F.3d at 32).

In Crowell, this Court had the opportunity to analyze the case in light of both Fitzer and Cabletron. Succinctly, in Crowell the plaintiff alleged that the defendant company "had schemed to inflate [a] product['s] sales and customer base artificially," by ordering the product's "sales force to deliver hundreds of thousands of unordered and unwanted [units] to [the] retail customers, one extra [unit] per customer." Id. at 6.

When the discussion focused on the particularity requirement, the defendants in Crowell argued that the plaintiff had the duty to "allege who the customers that received excess [products] were, as well as the time, terms, and amount of the specific transactions." Id. at 21. This Court, however, ruled that the plaintiff had pleaded the misstatement with sufficient particularity, because he "alleged a specific type of scheme, taking place over a specified time period, for a specified reason, with specified results, based on testimony of multiple witnesses with personal knowledge, and on reasonable inferences from the later downward adjustment in [the product]'s sales price."[6] Id.

Having the benefit of analyzing the present case with these precedents in mind, this Court views this case as closer to

---

[6] In Fitzer, on the other hand, the plaintiff failed on the particularity requirement, because although she "ha[d] made general allegations relating to channel stuffing activity . . . she ha[d] not supplied any of the details required to meet her pleading burden." Fitzer, 119 F. Supp. 2d at 36.

Crowell than to Fitzer. Here, the Plaintiffs (i) pointed to the statements they claim to be false or misleading (the many press releases and financial reports presenting financial revenues artificially inflated by accounting upfront revenue that should have been accounted ratably); (ii) identified the speakers responsible for such statements (broadly, the Avid Defendants, but each statement is attributed to one or more of them); (iii) defined where and when such statements were made (providing dates and context); and (iv) provided the reasons why each statement was fraudulent (broadly, to inflate the Company's revenue).

Now, while it is true that the Plaintiffs cannot allege by exactly how much the revenues were inflated, this ought not prevent them from surviving the motion to dismiss. Once more, because they do not have the benefit of discovery, the Plaintiffs are not required to plead evidence, as long as the misstatements are pled with enough particularity to comply with the heightened standards aforementioned. See Mississippi Pub. Emps.' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 90 (1st Cir. 2008) ("[T]his court has held that 'in determining the adequacy of a complaint . . . we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.' The law 'proscribes the pleading of 'fraud by hindsight,' but neither can plaintiffs be expected to plead

23

fraud with complete insight.'") (quoting Shaw v. Digital Equip.
Corp., 82 F.3d 1194, 1225 (1st Cir. 1996), superseded by statute
on other grounds, Reform Act).

In the end, this is not a strong case, such as Crowell.
Here, one can argue that the Plaintiffs rely too much on Avid's
voluntary disclosure of errors. This should not lead, however,
to the dismissal of the case. See In re Polaroid Corp. Sec.
Litig., 134 F. Supp. 2d 176, 186-87 (D. Mass. 2001) (Saris, J.)
("'[A] plaintiff may rely on the defendant's own disclosures
about a revenue restatement to allege that previously-made
statements about revenue were materially false or misleading.'
Pursuant to Regulation S-X, 17 CFR 210.4-01(a)(1), '[f]inancial
statements filed with the [SEC] which are not prepared in
accordance with generally accepted accounting principles will be
presumed to be misleading or inaccurate . . . .' 17 C.F.R.
210.4-01(a)(1).") (second, third and fourth alterations in
original) (internal citation omitted) (quoting Chalverus v.
Pegasystems, Inc., 59 F. Supp. 2d 226, 233 (D. Mass. 1999)).

Besides, there is not much more the Plaintiffs can do right
now, considering that, after almost a year since the Company
announced the restatements, they have not yet been published,
preventing the Plaintiffs from ascertaining the amount by which
the revenues were previously inflated. See Pls.' Mem. Opp'n
Avid 10 ("[E]ven after ten months, [Avid] has still yet to

24

complete its restatement and provide investors with an accurate set of financial statements.").

All in all, while this is not a textbook case for a successful fraud pleading, the misstatements regarding the improper recognition of PCS revenue were pled with sufficient particularity to survive the motion to dismiss. The same, however, cannot be said about the other two instances of fraud alleged in the amended complaint.

## b. The Manipulation of Restructuring Expenses[7]

---

[7] This claim was not part of the original complaint filed by Courtney, see Class Action Compl., ECF No. 1, although it was part of Washtenaw's original complaint, Compl. ¶ 92, Washtenaw Cnty. Emps.' Retirement Sys. v. Avid Tech., Inc., No. 13-cv-10686-WGY, ECF No. 1. The Avid Defendants argue this claim exists solely to justify Washtenaw's presence as a plaintiff in the case. As the Avid Defendants put it, "[Washtenaw] was so eager to sue in response to Avid's disclosure promising a restatement that it rushed to court even though it had not purchased a single share of Avid stock -- and had in fact sold its entire position -- fully eighteen months before Avid's announcement. Called out for seeking to represent a class it did not belong to, that plaintiff had to invent an entirely new claim. So the Amended Complaint accuses Avid of taking 'big bath' restructuring reserves in 2010 and 2011 so they would be available to leak back into earnings later." Avid's Reply 1 (internal citations omitted). Despite the Plaintiffs' silence, this explanation seems to make sense. Without the present (and the following) claim, it is hard to see how Washtenaw could establish loss causation for itself, considering it sold its position on Avid more than a year before the supposed truth about the improper recognition of PCS revenue -- Courtney's original claim -- hit the market. See Decl. Theodore M. Hess-Mahan Supp. Mot. Washtenaw Cnty. Emps.' Retirement Sys. Consolidation, Appointment Lead Pl. & Approval Selection Counsel, Ex. B, Certification Named Pl. Fed. Sec. Laws, ECF No. 8-3 (showing that Washtenaw acquired Avid stocks in March and

25

As to the second episode of fraud -- related to the manipulation of restructuring expenses –- the Avid Defendants claim that "[t]he complaint does not allege how or why the restructuring charges were false when made. Instead, it says only that Avid's charges were 'false' because" they were restated in later years. Avid's Mem. 12. According to the Avid Defendants, the lack of particularity in the Plaintiffs' pleading prevents the Court from "assess[ing] whether the restructuring charges were legitimate, erroneous, or purposefully inflated." Id. at 13.

The Plaintiffs affirm the sufficiency of the amended complaint, however, because it "alleges that the Avid Defendants improperly manipulated Avid's earnings by setting up excess reserves in prior periods, and then releasing the reserves into earnings in subsequent periods." Pls.' Opp'n Avid 13.

As explained supra, the discussion here concerns the four restructuring initiatives that Avid underwent between 2008 and 2012, and the later admission by the Company that it had identified errors in its previous financial statements regarding the restructuring expenses. Through the revised financial statements:

> [T]he Company increased its 2011 net restructuring costs by $1.3 million (or 14.7%) and reduced its 2010

April of 2011 and sold them in July and August of that same year).

net restructuring costs by $1.6 million (or 7.7%).
The Company increased its first quarter 2011 net
recovery of previously expensed restructuring costs by
$740,000 (or 33.4%), reduced its second quarter 2011
net recovery of previously expensed restructuring
costs by $325,000 (or 199.4%) and increased its fourth
quarter 2011 net restructuring costs by $240,000 (or
2.8%).

Am. Compl. ¶ 37. The Plaintiffs' argument is that, given the

"magnitude, pervasiveness, and repetitiveness of the . . .

restatements," it would be "reasonable to infer that these

restructuring costs were manipulated." Pls.' Opp'n Avid 13

(citing In re MicroStrategy Inc. Sec. Litig., 115 F. Supp. 2d

620, 635-37 (E.D. Va. 2000)).

        There seems to be a leap of logic here. The fact that the

restructuring costs were restated does not automatically lead to

the conclusion that they were manipulated. This simply is not a

reasonable inference.

        Here, the Plaintiffs rely solely on Avid's voluntary

disclosure of errors to ascertain the fraud. Again, while this

is not a problem per se, the particularity requirement makes it

impossible for this claim to survive because there is simply not

enough information about the alleged fraud. As the Avid

Defendants observed:

        The pleading does not identify the cost associated
        with any restructuring activity; and it does not say
        that Avid's expectations for those costs were off
        base. The [P]laintiffs do not claim that any
        assumption underlying Avid's estimates was invalid, or
        that the company's projections were not made in good

27

faith. In short, there is nothing in the document
. . . to even hint that Avid did not honestly believe
its charges to be reasonable estimates when taken.

Avid's Mem. 13.

Interestingly enough, some of the restatements increased

past restructuring costs, while others decreased such costs.[8]

Even from one quarter to the next, in the same year, this

"inconsistency" occurred.[9] These undisputed facts do not seem to

be in line with the Plaintiffs' argument that the manipulation

sought to set up excess reserves in prior periods, to

subsequently release them into earnings.

One cannot forget that restructuring expenses are by their

very essence an estimate, an anticipation of costs, and, as

such, inexact. Importantly, as the Avid Defendants do not fail

to observe, the Company disclosed in its reports "the inexact

nature of such estimates, stating that 'restructuring charges

and accruals require significant estimates and assumptions,

including sub-lease income assumptions.'" Avid's Mem. 13 n.5

(quoting Avid Tech. 10-K, issued Mar. 16, 2009).

Accordingly, this claim does not meet the heightened

standards of fraud pleading, see Crowell, 343 F. Supp. 2d at 12

---

[8] Per the restatements, Avid reduced its 2010 net
restructuring costs, while increasing such costs for 2011. Am.
Compl. ¶ 37.

[9] E.g., Avid increased its first quarter 2011 net recovery
of previously expensed restructuring costs, while reducing its
second quarter 2011 net recovery. Am. Compl. ¶ 37.

(quoting Gross, 93 F.3d at 991 (1st Cir. 1996)), and, as a
result, dismissal followed.

### c. The Decline of the European Operation

As to the third episode of fraud, the Avid Defendants claim
they had no affirmative duty to disclose information about the
decline of the Company's European Operation. Avid's Mem. 14.
Alternatively, the Avid Defendants claim that any prior
statement about future prospects of Avid's operation were non-
actionable puffery. Id. at 15.

The Plaintiffs' argument here is that for consecutive
reports since at least 2008, the Avid Defendants had been
misleading the market by "tout[ing] the Company's increasing
operating efficiency with respect to its sales force . . .,
increasing sales revenues, and positive company-wide growth in
the prior reporting periods." Am. Compl. ¶ 43. On July 21,
2011, however, the Avid Defendants "disclosed that the Company
badly missed sales revenues targets they had led investors to
expect, revealing for the first time that significant
deficiencies in the structure of Avid's European sales force
required a restructuring of the entire division." Id. ¶ 41.

The Plaintiffs allege that the pre-July 2011 statements
were clearly false. Furthermore, "[t]he need to restructure an
entire division's sales force was material to shareholders. . .
. While companies do not have to disclose all information that

may affect stock prices, '[w]hen a corporation does make a
disclosure - whether it be voluntary or required – there is a
duty to make it complete and accurate.'" Pls.' Opp'n Avid 15
(second alteration in original) (quoting Rosenbaum Capital
L.L.C. v. Boston Commc'n Grp., Inc., 445 F. Supp. 2d 170, 175-76
(D. Mass. 2006)).

Before assessing the viability of the present claim, two
aspects of the law must be described. The first regards
"puffery." As the First Circuit has explained, "courts have
demonstrated a willingness to find immaterial as a matter of law
a certain kind of rosy affirmation commonly heard from corporate
managers and numbingly familiar to the marketplace - loosely
optimistic statements that are so vague, so lacking in
specificity, or so clearly constituting the opinions of the
speaker, that no reasonable investor could find them important
to the total mix of information available." Shaw v. Digital
Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996), superseded by
statute on other grounds, Reform Act.

The second concerns mismanagement claims. As this Court
observed in Fitzer, "management problems . . . are not, on their
own, actionable as fraud. These include allegations of
disruption and dissension in the sales force . . . . Although
these allegations, if true, certainly could disappoint an
investor who may have believed that [the company] could have

succeeded, poor management is a risk that every investor takes. Damages flowing therefrom are not actionable under the securities laws." <u>Fitzer</u>, 119 F. Supp. 2d. at 31 (internal citation omitted).

In the present case, the claims regarding the decline of Avid's European Operation are a result both of puffery and mismanagement and are, therefore, non-actionable.

Going back to the allegedly false statements, they are no more than the garden-variety puffery. The example cited by the Plaintiffs in their amended complaint is very illustrative:

> **These results show that we're seeing the benefits of focusing on our strategic principles and continuing to improve our operational efficiency.** Back in July of 2008 we laid out a three-stage transformational plan for the company; to get healthy, build momentum in the core business and unlock new sources of growth. While we will continue to be diligent in managing our cost structure, we feel that we're moving beyond the get-healthy phase of our transformation and can be even more focused on continuing to build momentum in our core business while looking at other potential alternatives to improve our revenue growth.

Am. Compl. ¶ 44 (emphasis in original) (quoting Avid Press Release on February 4, 2011).[10] This statement is very similar to those analyzed by this Court in <u>Fitzer</u>, where the defendant company released statements mentioning the acceleration of

---

[10] The Plaintiffs also point to another statement, made by Sexton, the CFO, according to which "[the Company] had growth in products and services across all major geographies." <u>Id.</u> ¶ 82. This statement essentially follows the same line of the one quoted above.

efforts and abilities to better position the company in the
market. These are the typical rosy statements insufficient to
mislead a reasonable investor. See Fitzer, 119 F. Supp. 2d at
30 ("These statements indicat[ing] that the integration
'accelerated' [the company's] efforts and abilities, and that
the result would be a 'preferred' product and would 'position
[the company] to be the first to offer such a solution . . . are
no more than corporate 'puffery' that cannot be said to have
misled investors."). The fact that the statements promoting
Avid's efficiency were repetitive, and endured for years, does
not change the analysis.

The Plaintiffs also rely on a confidential witness in order
to claim that "the European problems did not develop overnight,
and it was [the CEO] Greenfield's lack of understanding
regarding retail that caused the European issues." Pls.' Opp'n
Avid 15. Or, as stated in the Amended Complaint, "the issue in
Europe was caused by Greenfield's decision to restructure
inappropriately and raise prices that were in set price points.
. . . Thus, according to [the confidential witness], the lack of
understanding of retail . . . killed the European retail
business." Am. Compl. ¶ 45.

As sad as it may be, this is a case of alleged
mismanagement, which cannot be claimed as securities fraud.
Greenfield's alleged "lack of retail experience," with the

32

consequent failure of Avid's European Operation, standing alone, does not amount to fraud, and the fact that the Company touted its efficiency while having operational challenges does not change that.

All in all, puffery and mismanagement, although disappointing to investors, are not sufficient to survive a motion to dismiss in a securities fraud action.

After the analysis of the material misstatement requirement, only the first claim of fraud, related to the improper recognition of PCS revenue, survives. But this claim is also attacked by the Avid Defendants as to the scienter requirement. An analysis of this argument follows.

## 2. The Amended Complaint Raises a "Strong Inference" of Scienter

As mentioned supra, "[s]cienter can be proved by showing either knowledge that the statements at issue were materially false or misleading, or recklessness in that regard, and the complaint must so plead." Lenartz, 879 F. Supp. 2d at 181.

In the present case, the Avid Defendants argue that "not one allegation in the Amended Complaint identifies a specific document, meeting, or accounting transaction that supports an inference that any Avid Defendant knew of any accounting error related to a software update." Avid's Mem. 16.

The Plaintiffs plead scienter by pointing at a series of facts, in tune with the First Circuit's "fact-specific inquiry" approach to scienter. Greebel, 194 F.3d at 196. The amended complaint presents a series of facts as the basis for the Plaintiffs' allegations of scienter. Considered holistically, the facts set forth by the Plaintiffs add up to a strong inference of scienter, as is required under the Reform Act. See id.

First, the Plaintiffs claim that Greenfield personally decided to take the PCS revenue up front, instead of ratably. Am. Compl. ¶ 34. The allegation is supported by a confidential witness and is described with sufficient particularity to support a securities fraud claim. See Fitzer, 119 F. Supp. 2d at 22 ("[W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.") (quoting Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)).

Here, the Plaintiffs allege that "Greenfield demonstrated his knowledge of GAAP's revenue recognition criteria" and the Company repeatedly stated it followed GAAP requirements. See Am. Compl. ¶ 28 (quoting Avid's Form 10-K for the year 2011 for the proposition that the Company followed GAAP criteria); id. ¶ 31 (quoting Greenfield's statement in a conference call in 2012, explaining that the Company recognized revenue upon implementation). The Plaintiffs further argue that, despite his demonstrated knowledge, Greenfield decided to recognize PCS revenue up front. Id. ¶ 34. This allegation is supported by a confidential witness, who was a vice president of Video and Enterprise at the Company and attended weekly meetings with Greenfield during the Class Period. Id. As described in the amended complaint, "[a]ccording to [the confidential witness], certain management opted to take revenue sooner, and the service revenue would be built in so the company could take the revenue up front. According to [the confidential witness], it was Greenfield's and [Beth] Martinko's[11] decision to do it this way." Id. The amended complaint is thus clear about the fact that, not only did Greenfield know that the PCS revenue was inappropriately accounted up front, but he actually decided to do so.

---

[11] Beth Martinko, then vice-president at Avid, is not a defendant in this lawsuit.

The Plaintiffs also claim insider trading. See id. ¶ 131.

According to them:

> [D]uring the Class Period, while the Company's share price was artificially inflated due to Defendants' materially false and misleading statements and omissions, Company insiders, including Defendants Greenfield and Sexton, unloaded 70,275 shares of their Avid stock for proceeds of $771,306.18. Significantly, Defendant Greenfield's largest sale of Avid stock (16,151 shares for $126,947) came only a little over a week before the Company announced the need to restate its financials.

Id.

As the First Circuit has already observed, "[i]nsider trading cannot establish scienter on its own, but it can be used to do so in combination with other evidence. Insider trading in suspicious amounts or at suspicious times may be probative of scienter." Mississippi Pub. Emps.' Ret. Sys., 523 F.3d at 92 (internal citations omitted).

The Plaintiffs, however, fail to provide the Court with enough information to support their claim of suspicious insider trading. As this Court observed in Lenartz, the plaintiff "bears the burden of showing that insider sales were in fact unusual or suspicious in timing or amount. Such a showing requires the plaintiff to provide information on the defendant's trading both before and after the class period, so the court can assess the sales in context." Lenartz, 879 F. Supp. 2d at 186 (internal citations omitted).

36

Here, the Plaintiffs merely allege suspicious insider trading by Greenfield and Sexton, without providing any context. The Plaintiffs solely present a list of transactions made by Greenfield and Sexton during the Class Period, Am. Compl. ¶ 20, but there is no basis to compare such trading with other periods. As a result, the Court cannot fully appreciate the allegation, and thus the insider trading allegation is not of much help to the Plaintiffs.[12]

Next, the Plaintiffs point to the resignations of the Company's senior executives. According to the Plaintiffs:

> Greenfield resigned two weeks prior to the announcement that Avid was unable to timely report its financial results for the fourth quarter of 2012, as it needed additional time to review certain transactions. Further, a month prior to the final announcement regarding the restatement, Avid disclosed that Sexton was being relieved of his duties.

Pls.' Opp'n Avid 19 (internal citations omitted).

The Plaintiffs do not point to any precedent from the First Circuit deriving scienter from the resignation of a company's senior executives; they rely instead on decisions from the Southern District of New York. Id. In one of those cases, the court noted that "[the executive]'s resignation by itself is

---

[12] The Avid Defendants also argue that the sale of stocks by Greenfield and Sexton was made pursuant to "a non-discretionary withholding of shares by Avid to satisfy tax withholding obligations upon a vesting event." Avid's Mem. 20. Because of its conclusion that the insider trading claim does not support the scienter inference, the Court need not engage with this argument.

insufficient to support an allegation of scienter because 'there
are any number of reasons that an executive might resign.'
However, when considered in conjunction with the rest of
Plaintiffs' allegations, a strong inference of scienter has been
stated with particularity."[13]  Ho v. Duoyuan Global Water, Inc.,
887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (internal citation
omitted) (quoting In re BISYS Sec. Litig., 397 F. Supp. 2d 430,
446 (S.D.N.Y. 2005)).

    The problem with the Plaintiffs' allegation is that they
bring no other facts to support the conclusion that the
resignations indicate scienter.  The Plaintiffs rely solely on
the timing of the resignations - close to the Company's
disclosure of the misstatements.  This is not enough to build up
the scienter inference.  See In re BISYS, 397 F. Supp. 2d at
446-47 ("Plaintiffs claim that the resignations of [the
executives] 'shortly before and/or coterminous with [the
company's] disclosures of financial shortfalls, financial
charges, improper accounting and financial restatements' support
an inference of scienter.  Plaintiffs, however, have alleged no
facts linking the resignation of [the executives] to the
accounting improprieties at [the company].  In reality, there
are any number of reasons that an executive might resign, most

_____

[13] The other case cited by the Plaintiffs, In re Sadia, S.A.
Sec. Litig., 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009), does not
really discuss this issue.

38

of which are not related to fraud. . . . Accordingly, absent any alleged facts linking the two resignations and the alleged fraud, the resignations of [the executives] do not support an inference of conscious misbehavior or recklessness.").

Moving on, the Plaintiffs point to the length and magnitude of the restatement as an indication of scienter. According to the Plaintiffs, the restatement covers "a large number of transactions over the past five years." Pls.' Opp'n Avid 19-20. Not only that, "the restatement covers fundamental accounting rules applicable to software, Avid's core business – a violation that 'suggest[s] a conscious choice to recognize revenue in a manner alleged to be improper.'" Id. at 20 (alteration in original) (quoting In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 21 (D.D.C. 2000)).

Courts in this District have often given some weight to the magnitude and frequency of the restatements in supporting an inference of scienter. See In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 147 (D. Mass. 2001) (Saris, J.) (including "the magnitude of the accounting overstatement" among the circumstances indicative of fraudulent intent); see also Gelfer v. Pegasystems, Inc., 96 F. Supp. 2d 10, 16 (D. Mass. 2000) (Tauro, J.) ("The magnitude and frequency of the restatements create a strong inference of scienter.").

In the present case, the magnitude of the restatement is evinced by the fact that after almost one year since it was announced, the restatement is still not complete. The magnitude is also emphasized by Avid's recently filed Form 8-K, where it informs that, "given the scope of the review," the Company will probably fail to regain compliance with its SEC filing requirements for continued listing of its common stock on NASDAQ before the deadline set by the NASDAQ Listing Qualifications Panel.[14] Lead Pls.' First Req. Judicial Not. Opp'n Defs.' Mot. Dismiss, Ex. A, Form 8-K, Dec. 31, 2013, at 6, ECF No. 53-1.

---

[14] Avid further states in the Form 8-K:

Avid Technology, Inc. . . . has determined that it is unlikely that it will be able to regain compliance with its SEC filing requirements for continued listing of its common stock on [NASDAQ] by the previously reported March 14, 2014 deadline set by the NASDAQ Listing Qualifications Panel. As previously reported, the Company is in the process of restating its financial statements for the fiscal years ended December 31, 2011, 2010 and 2009 and for its quarterly periods ended September 30, 2012 and 2011, June 30, 2012 and 2011, and March 31, 2012 and 2011. The restatement relates to the Company's accounting treatment of certain upgrades, enhancements and compatibility extensions (collectively "Software Updates") it previously made available to certain of its customers at no-charge. The Company has determined that such Software Updates should have been accounted for as implied [PCS] under [GAAP]. As a result of the pending restatement of prior financial results, the Company is not current in its periodic report filing requirements with the SEC. While the Company has been working diligently to complete the restatement and regain compliance with its reporting requirements, the Company has determined that, given the scope of the review, it will be unlikely to achieve these objectives prior to the March 14, 2014 deadline.

Accordingly, it is as yet unknown what the impact of such a restatement will be, but that cannot impair the Plaintiffs' claim. The length and magnitude of the restatement here leads to a strong inference of scienter, indeed suggesting a conscious choice by the Defendants, or at least an extreme departure from the standards of ordinary care.

Another fact that contributes to the strong inference of scienter comes from Avid's systemic failure to maintain adequate internal controls. The Plaintiffs describe in detail the many instances where the Company acknowledged internal control deficiencies. See Pls.' Opp'n Avid 7 (listing the repeated admissions of such flaws and concluding that "since the outset of the Class Period, Avid was forced to admit to its haphazard internal controls on at least five separate occasions, raising glaring red flags regarding the integrity of its financial statements").

Taken together with the magnitude of the restatement, the consistent failure as to the internal controls makes the scienter inference more compelling. See Crowell, 343 F. Supp.

As a result . . . the Company's shares of common stock may be suspended from trading and delisted from [NASDAQ]. Following a possible suspension of trading in the Company's common stock on NASDAQ, the Company expects that its shares would trade on the OTC Markets – OTC Pink Tier while the Company works to finalize the restatement.
Lead Pls.' First Req. Judicial Not. Opp'n Defs.' Mot. Dismiss, Ex. A, Form 8-K, Dec. 31, 2013, at 6, ECF No. 53-1.

2d at 16 ("The way in which the allegedly fraudulent acts
[including fraudulent contract accounting and failure to
maintain adequate internal controls] fit together and reinforce
one another strongly suggests a conscious course of conduct.").

Finally, the Plaintiffs refer to government investigations
as a support for an inference of scienter. According to the
Plaintiffs, "[s]hortly following the Company's February 25, 2013
announcement regarding the delayed financials, the Company
received a document preservation request from the SEC and a
federal grand jury subpoena from the [Department of Justice]
related to its accounting practices and procedures, including
the accounting treatment related to Software Updates." Pls.'
Opp'n Avid 20. The Plaintiffs believe this investigation
"add[s] to the overall picture." Id.

The Plaintiffs cannot cite to precedents from this District
or the First Circuit in this regard; it is true, however, that
courts in other circuits have concluded that governmental
investigation can be considered in an analysis of scienter,
although it is insufficient in and of itself. See In re Gentiva
Sec. Litig., 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013)
("Certainly, courts have considered a governmental investigation
as one piece of the puzzle when taking a 'holistic' view of the
purported facts as they relate to scienter. The Court agrees
that while the existence of an investigation alone is not

sufficient to give rise to a requisite cogent and compelling inference of scienter, it may be considered by the Court as part of its analysis.") (internal citation omitted); see also Chamberlain v. Reddy Ice Holdings, Inc., 757 F. Supp. 2d 683, 713 n.8 (E.D. Mich. 2010) (attaching relevance to the existence of government investigations, albeit noting its insufficiency, standing alone, to support a strong inference of scienter); In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (including an investigation by the Department of Justice as one of the elements in the scienter analysis); In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 688 (S.D. Tex. 2002) (including facts "unearthed in current investigations by the SEC" in the scienter analysis).

Here, the government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter. As the Supreme Court explained in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23. Accordingly, the fact that a circumstance is not sufficient per se to establish the

requisite scienter ought not control the outcome, lest we see the trees but miss the forest.[15]

Among the Avid individual Defendants, this Court can infer (for the purposes of this motion) that Greenfield -- as the Company's CEO, President, and Chairman of the Board -- and Sexton -- as the Company's CFO, Executive Vice President, and Chief Accounting Officer -- knew or should have known of Avid's practices of improperly recognizing revenue, because their positions during the Class Period gave them unfettered access to the information. See Crowell, 343 F. Supp. 2d at 17-18. The Plaintiffs also mention the confidential witness's statement that the accounting classification was a deliberate choice made by Greenfield. Accordingly, there is a strong inference of scienter as to these two defendants.

The same, however, cannot be said of Hernandez, who was appointed as Avid's CEO and President immediately after Greenfield's resignation, i.e., after all of the alleged misstatements had occurred. There is not a single claim against Hernandez in the amended complaint, and he is not even mentioned in the "Parties" section of the complaint - or in any other part

---

[15] Or, as once put by this Court, "[a]lthough none of the general allegations proffered by the [plaintiffs] in their Complaint is determinative on its own, this Court may consider them together as indicative of fraudulent intent. In determining scienter, courts can look to the totality of the circumstances, rather than examining each alleged omission or misstatement in isolation." Orton, 344 F. Supp. 2d at 307.

of it other than the caption. Accordingly, the Court allows his motion to dismiss.

As things stand, this is not a strong case of securities fraud. All in all, however, the Plaintiffs manage to survive the Avid Defendants' motion to dismiss as to the PCS-related claim. Hernandez, however, ought be off the hook.

## E. Ernst & Young

Ernst & Young's motion to dismiss focuses solely on the scienter requirement.[16] Its essential contention is that the Plaintiffs failed to plead sufficient facts to meet the particularly high standard of scienter required against independent auditors. Ernst & Young's Mem. 5-8.

Initially, this Court acknowledges that "[c]ourts assessing claims against independent accountants and auditors under the [Reform Act] have placed the bar high." In re Raytheon, 157 F. Supp. 2d at 154; see id. ("For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.") (quoting Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000)).

---

[16] Ernst & Young's motion to dismiss is now limited to the PCS-related claim of fraud because, as explained above, the other two claims are dismissed.

Here, once again, the Plaintiffs rely on a series of facts
to build up a strong inference of scienter. These alleged facts
mostly parallel those assessed in resolving the Avid Defendants'
motion to dismiss, but there are also a couple of specific
allegations related solely to Ernst & Young. In short, this is
what the Plaintiffs point to: "(i) the audit's deficiency; (ii)
the magnitude of the accounting error;" (iii) some red flags
that should have demanded further inquiry from Ernst & Young;
"(iv) the repeated violations of GAAP, [Generally Accepted
Auditing Standards ("GAAS")], and internal audit procedures; (v)
the desire to protect profits, and the longstanding nature of
the relationship between Ernst & Young and Avid;" and (vi) the
findings of a report by the Public Company Accounting Oversight
Board (the "Oversight Board"), showing deficiencies in Ernst &
Young's "audit system of quality control." Pls.' Opp'n Ernst &
Young 20.

In the analysis of Avid's motion to dismiss, the Court
mentioned that the length and magnitude of the accounting error
was an important piece of the puzzle. The same was said about
Avid's systemic failure to maintain adequate internal controls.
Importantly, as the Plaintiffs argue in their opposition to
Ernst & Young's motion, the longstanding relationship between
Ernst & Young and Avid enabled the former to acquire great
knowledge of the latter's auditing system over time. See id. at

46

9. Accordingly, Ernst & Young presumably knew about Avid's consistent internal controls' failures.

Ernst & Young insists that the revelations about Avid's flawed internal controls came only after Ernst & Young had presented the audit opinions at issue here. Ernst & Young's Mem. 16-17; Ernst & Young's Reply 6. While it is true that Avid's voluntary disclosure of such shortcomings came only after Ernst & Young's final audit opinion, dated February 29, 2012, this does not mean that the shortcomings were unknown to both companies before the opinion was filed. As the Plaintiffs explain:

[Ernst & Young]'s argument is nothing more than an effort to shift the focus to when Avid made the disclosures; the timing of when Avid revealed the existence of the internal control deficiencies is not relevant to [Ernst & Young]'s culpability. What is relevant is that Avid's disclosures revealed that the deficiencies existed and were known to the Company and [Ernst & Young] at the end of 2011. For example, in its Form 10-Q for the first quarter of 2012, Avid acknowledged "previously identified internal control deficiencies in [its] assessment of internal control over financial reporting as of December 31, 2011," thereby admitting that such deficiencies were known by both Avid and [Ernst & Young] at the time of the issuance of Avid's 2011 Form 10-K.

Pls.' Opp'n Ernst & Young 15 n.6 (penultimate alteration in original) (emphasis omitted).

As observed in dismissing Avid's motion, the scienter analysis is very fact-intensive; as a result, precedents can only go so far in marking a path for the scienter analysis.

Considering the longstanding relationship between Avid and Ernst & Young, the length and magnitude of the restatements, and the repeated failure by Avid to maintain adequate internal controls, a strong inference of scienter can be drawn. At least the Plaintiffs successfully plead an egregious degree of recklessness by Ernst & Young.

In this context, the Plaintiffs' claim that Ernst & Young turned a blind eye to Avid's bad practices, aiming to protect a profitable relationship, id. at 17, helps build up the scienter inference. As the First Circuit observed:

> [S]uch a profit motive could contribute to an auditor's decision to turn a blind eye to a corporation's misleading accounting. Such allegations can thus strengthen an inference of scienter predicated on other facts, possibly adding sufficient strength to satisfy the strong-inference requirement of [the Reform Act]. On the other hand, absent truly extraordinary circumstances, an auditor's motivation to continue a profitable business relationship is not sufficient by itself to support a strong inference of scienter.

In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 215 (1st Cir. 2005) (internal citations and quotation marks omitted).

In Stone & Webster, the First Circuit held scienter was not adequately pled because, besides the allegation of profit protection, "there was virtually nothing else." Id. Still, the framework laid out by the First Circuit stands true, and here the profit protection allegation adds to an already consistent scienter pleading. In fact, the Plaintiffs point to the length

and magnitude of the accounting error, to Avid's systemic

failure to maintain adequate internal controls, and finally to

the profit protection motivation.[17]

Thus, adopting the holistic approach established in

Tellabs, the Plaintiffs meet, albeit barely, the high threshold

for a successful scienter pleading against Ernst & Young.

Accordingly, the Plaintiffs manage to survive Ernst & Young's

motion to dismiss, at least as to the PCS-related claim.

## III. CONCLUSION

For the aforementioned reasons, this Court ALLOWED both

motions to dismiss as to the second and third fraud claims,

related to the restructuring of the Company and the European

---

[17] The remaining argument presented by the Plaintiffs --
regarding the findings of a report by the Oversight Board,
showing deficiencies in Ernst & Young's audit system of quality
control -- does not help the Plaintiffs' case.

According to the Plaintiffs, the report "found that [Ernst
& Young] failed to remediate deficiencies in its audit system of
quality control, dating as far back as 2009. The report noted
that certain of the deficiencies were 'audit failures,' stating
that 'certain of the identified deficiencies were of such
significance that it appeared that [Ernst & Young], at the time
it issued its audit report, had failed to obtain sufficient
appropriate audit evidence to support its audit opinion on the
financial statements and/or on the effectiveness of internal
control over financial reporting." Pls.' Opp'n Ernst & Young
19-20 (internal citations omitted).

The report's conclusion has nothing to do with fraud or
extreme recklessness. On the contrary, it relates to alleged
incompetency by Ernst & Young, which adds nothing to a scienter
inference. Furthermore, the report does not concern Ernst &
Young's body of work at Avid, but rather other audit procedures
made by the auditing firm. See Ernst & Young's Mem. 17-18.
Accordingly, the report's conclusions are not relevant to the
outcome of the present case.

sales operation, and now DENIES both motions as to the first

fraud claim, pertaining to post-contractual customer support.

As to the defendant Louis Hernandez, the motion to dismiss is

ALLOWED.

The case is ordered onto the running trial list for March

2015. The parties shall have 14 days from the date of this

order to submit a joint case management schedule.

**SO ORDERED.**

William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE