**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| MICHAEL COURTNEY, Individually and On Behalf of All Other Persons Similarly Situated, | ) ) ) | Civil Action No. 1:13-cv-10686-WGY |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| AVID TECHNOLOGY, INC., GARY G. GREENFIELD, KENNETH A. SEXTON; and ERNST & YOUNG, LLP, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**REPLY BRIEF IN FURTHER SUPPORT OF LEAD PLAINTIFF'S**
**MOTION FOR CLASS CERTIFICATION**

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................2

    I.     DEFENDANTS' MISREPRESENTATIONS REGARDING AVID'S
          FINANCIAL CONDITION, INTERNAL CONTROLS AND
          MANAGEMENT'S INTEGRITY CAUSED AVID STOCK TO TRADE
          AT AN INFLATED VALUE THROUGHOUT THE CLASS PERIOD ................2

    II.    COMMON QUESTIONS PREDOMINATE ...........................................................4

          A.    *Basic*'s Presumption of Reliance Is Rebutted Only if Defendants
                 Carry Their Burden of Proving Zero Price Impact as a "Matter of
                 Law." ...................................................................................................4

          B.    Defendants Have Failed To Carry Their Burden of Proving Lack of
                 Price Impact In Order to Defeat *Basic*'s Presumption of Reliance. ...........7

          C.    A Fluctuation in the Amount of Inflation in Avid's Stock Price
                 During the Class Period Does Not Defeat *Basic*'s Presumption of
                 Reliance ...............................................................................................12

    III.   LEAD PLAINTIFF'S PURCHASE DATES DO NOT RENDER HIM
          ATYPICAL ..................................................................................................15

    IV.   THE CLASS DEFINITION IS APPROPRIATE. .................................................17

CONCLUSION .........................................................................................................................19

i

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Pages**

*Abrams v. MiMedix Group, Inc.*,
    No. 1:13-cv-3074, 2014 WL 3952923 (N.D. Ga. Aug. 13, 2014) ................................... 11

*Acticon AG v. China N.E. Petroleum Holdings, Inc.*,
    692 F.3d 34 (2d Cir. 2012)...................................................................................... 11, 19

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S.Ct. 1184 (2013) ................................................................................................... 6

*Aranaz v. Catalyst Pharm. Partners Inc.*, No. 13-cv-23878,
    2014 WL 4814352 (S.D. Fla. Sept. 29, 2014) ............................................................ 8, 9

*AUSA Life Ins. Co. v. Ernst & Young*,
    206 F.3d 202 (2d Cir. 2000)....................................................................................... 13

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ..................................................................................... 15

*Bovee v. Coopers & Lybrand*,
    216 F.R.D. 596 (S.D. Ohio 2003) ..................................................................................16

*Brumbaugh v. Wave Sys. Corp.*,
    416 F. Supp. 2d 239 (D. Mass. 2006) ............................................................................ 10

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)................................................................................ *passim*

*City of Omaha Police and Fire Ret. Sys. v. LHC Group, Inc.*, No. 6:12-1609,
    2013 WL 1100819 (W.D. La. Mar. 15, 2013) ............................................................... 10

*Dietrich v. Bauer*,
    192 F.R.D. 119 (S.D.N.Y. 2000) ................................................................................ 16

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..................................................................................................... 18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011) ........................................................................................ 1, 4, 8

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................... 10

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S.Ct. 2398 (2014).............................................................................................. 1, 5

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) ...................................................................... 16

*In re Apollo Group, Inc. Sec. Litig.*, No. CV-10-1735,
   2011 WL 5101787 (D. Ariz. Oct. 27, 2011) ..................................................... 10

*In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431,
   1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) ................................................... 16

*In re Ashanti Goldfields Secs. Litig.*, No. CV 00-0717,
   2004 WL 626810 (E.D.N.Y. Mar. 30, 2004) .................................................... 15

*In re Bearingpoint, Inc. Sec. Litig.*,
   232 F.R.D. 534 (E.D. Va. 2006) ....................................................................... 16

*In re Bradley Pharm., Inc. Sec. Litig.*,
   421 F. Supp. 2d 822 (D.N.J. 2006) ................................................................... 10

*In re Credit Suisse-AOL Sec. Litig.*, No. 02-cv-12146,
   2011 WL 3813204 (D. Mass. Aug. 26, 2011) ..................................................... 7

*In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825,
   2008 WL 820015, at *3 (E.D.N.Y. Mar. 24, 2008) .......................................... 15

*In re Evergreen Ultra Short Opportunities*,
   275 F.R.D. at 392 ............................................................................................. 18

*In re Gaming Lottery Sec. Litig.*,
   58 F. Supp. 2d 62 (S.D.N.Y. 1999) ................................................................... 17

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................. 9

*In re Intelligroup Sec. Litig.*,
   468 F. Supp. 2d 670 (D.N.J. 2006) ................................................................... 13

*In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013,
   2006 WL 330113 (S.D.N.Y. Feb. 14, 2006) ..................................................... 15

*In re Organogenesis Sec. Litig.*,
   241 F.R.D. 397 (D. Mass. 2007) ....................................................................... 17

*In re Sadia, S.A. Sec. Litig.*,
   269 F.R.D. 298 (S.D.N.Y. 2010) ....................................................................... 17

*In re Sanofi-Aventis Sec. Litig.*,
   293 F.R.D. 449 (S.D.N.Y. 2013) ....................................................................... 11

*In re Seitel, Inc. Sec. Litig.*,
    447 F. Supp. 2d 693 (S.D. Tex. 2006) ........................................................................ 18

*In re Tyco Int'l, Ltd.*,
    236 F.R.D. 62 (D.N.H. 2006) ...................................................................................... 18

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ........................................................................................ 16

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C,
    5893, 2012 WL 4343223 (N.D. Ill. Sept. 21, 2012) ................................................... 18

*Lawrence v. Philip Morris* Co., No. 94-CV-1494,
    1999 WL 51845 (E.D.N.Y. Jan. 9, 1999) ................................................................... 16

*Local 703, I.B. of T. Grocery and Food Employees Welfare Fund v. Regions*
    *Financial Corp.*, No. CV 10-J-2847-S,
    slip op. at 17-20 (N.D. Ala. Nov. 29, 2014) ................................................................ 5

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ...................................................................................... 10

*McIntire v. China MediaExpress Holdings, Inc.*, No. 11-CV-0804 VM,
    2014 WL 4049896 (S.D.N.Y. Aug. 15, 2014) ......................................................... 5, 7

*Michaels v. Ambassador Group, Inc.*,
    110 F.R.D. 84 (E.D.N.Y. 1986) .................................................................................. 17

*Natchiotches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
    247 F.R.D. 253 (D. Mass. 2008) ................................................................................. 18

*North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
    929 F. Supp. 2d 740 (M.D. Tenn. 2013) ..................................................................... 11

*Oxford Health Plans, Inc. Sec. Litig.*,
    191 F.R.D. 369 (S.D.N.Y. 2000) ................................................................................ 13

*Police & Fire Ret. Sys. v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009) ........................................................................ 10

*Pub. Employees Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ........................................................................................ 9

*Regions Financial Corp.*, No. CV 10-J-2847-S,
    slip op. at 17-218 ......................................................................................................... 9

*Seagate Tech. II Sec. Litig.*,
    843F. Supp. 1341 (N.D. Cal. 1994) ............................................................................ 13

*Seijas v. Republic of Arg.*,
    606 F.3d 53 (2d Cir. 2010)............................................................................................ 17

*Swack v. Credit Suisse First Boston*,
    230 F.R.D. 250 (D. Mass 2005)................................................................................... 16

*Trief v. Dun & Bradstreet Corp.*,
    144 F.R.D. 193 (S.D.N.Y. 1992) ................................................................................. 15

## **RULES**

Fed. R. Civ. P. 50(a) ...................................................................................................... 6

Fed. R. Civ. P. 50(b) ...................................................................................................... 6

Fed. R. Civ. P. 56(a) ...................................................................................................... 6

## INTRODUCTION

Defendants concede that Avid securities traded in an efficient market and that Lead Plaintiff relied on the integrity of the market price when making his purchases. Defendants also do not refute the findings of Lead Plaintiff's market expert, Professor Steven P. Feinstein, PH.D., CFA, that Avid's false earnings reports issued during the Class Period and the February 25, 2013 corrective disclosure had statistically significant effects on the price of Avid stock. Defendants nevertheless contest the Federal Rules of Civil Procedure requirements of predominance and typicality, arguing that *Basic*'s fraud-on-the-market presumption of reliance is inapplicable in this case.

As to predominance, Defendants argue that *Basic*'s presumption is rebutted because inflation in Avid's stock fluctuated during the Class Period and because the February 25, 2013 corrective disclosure did not fully reveal all aspects of Defendants' fraud. While Defendants attempt to characterize these arguments as proof of no "price impact" under *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2414 (2014) ("*Halliburton II*"), in reality they dispute loss causation, an issue that is inappropriate for determination at class certification. *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2181 (2011) ("*Halliburton I*").

Moreover, *Halliburton II* made clear that, in order to rebut the presumption of reliance, it is Defendants' burden to establish that the alleged misrepresentations had *zero* impact on the price of the security. Here, not only have Defendants failed to provide any evidence of zero price impact, but the uncontested facts demonstrate that Avid's stock experienced statistically significant price movements following both the alleged misrepresentations as well as the alleged corrective disclosure.  Price impact cannot be seriously disputed—let alone rebutted—in this Action.

As to typicality, Defendants argue that because Lead Plaintiff purchased his shares during a period in which (Defendants claim) revenues were under-reported, rather than over-reported, he

experienced no damages, providing a "unique defense" and rendering him atypical.  But this argument fails for two reasons.  First, the under-reporting of revenues in 2011 does not magically eliminate the inflation introduced into Avid's stock through the six prior years of vastly overstated revenues or the inflation introduced throughout the Class Period as a result of Defendants fraudulent "smoothing" of earnings. *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 234 (2d Cir. 2014). Second, Lead Plaintiff purchased almost all of his shares *before* the publication of the 2011 annual report in February 2012, mooting Defendants' attack. In any event, because Avid's stock traded on an efficient market, any dispute over the degree of inflation at the time of Lead Plaintiff's purchases would apply to all Class members who purchased in the same time frames. Disputes over amounts of inflation during the Class Period are issues of damages, inappropriate for adjudication at this stage.  They certainly provide no basis to deny class certification.

## ARGUMENT

### I. DEFENDANTS' MISREPRESENTATIONS REGARDING AVID'S FINANCIAL CONDITION, INTERNAL CONTROLS AND MANAGEMENT'S INTEGRITY CAUSED AVID STOCK TO TRADE AT AN INFLATED VALUE THROUGHOUT THE CLASS PERIOD

The thrust of Defendants' opposition to class certification is that despite the massive overstatement of revenues between 2005 and 2010, the understatement of revenues for 2011 would have deflated Avid's stock price.  In making this argument, Defendants completely ignore the context of this understatement of revenues as well as the many other financial metrics that were drastically inflated during 2011.

Avid was forced to restate its financials for 2005 through 2011.  ***During this period, the Company improperly over reported its revenues by an astonishing $897.8 million***.  *See* Declaration of Jeremy A. Lieberman ("Lieberman Decl."), Ex. A (Report of Professor Steven P. Feinstein,

PH.D., CFA, October 31, 2014 ("Feinstein Oct. 31, 2014 Report") at ¶ 21.   The fact that the Company understated revenues by $89 million in 2011 does not change the fact that total reported revenues were cumulatively overstated throughout the Class Period.

The restatement also revealed that Defendants had been using accounting machinations to "smooth earnings."   The Company originally represented that revenues steadily climbed between 2009 and 2011 from $629 million to $677 million. *Id.* at ¶ 11.   The restatement revealed that, in reality, revenues swung up and down in a very wide range, over $250 million, with 50% overstatement at one point. *Id.*   Moreover, the restatement had a significant impact on the revenues trend for post-2011 years. As the Company explained, recognized revenues for 2012 and 2013 actually *declined* relative to 2011 as a result of the restatement, and would continue to decline thereafter:

> These decreases in revenues from continuing operations were primarily the result of lower amortization of deferred revenues (that is, lower recognition of revenue backlog) attributable to transactions executed on or before December 31, 2010... As a result of the change in accounting standards, even with consistent or increasing aggregate order values, ***we will experience significant declines in revenues, deferred revenues and revenue backlog in the coming years*** as revenue backlog associated with transactions occurring prior to January 1, 2011 decreases each quarter without being replaced by comparable revenue backlog from new transactions.

*Id.* at ¶ 15 (citation omitted) (emphasis added).[1]

An examination of the restatement of other financial metrics further demonstrates that Avid's financial condition was otherwise overstated for 2011. For 2009, 2010 and 2011, the Company

---

[1] A similar phenomenon occurred with Avid's net income. Avid originally reported GAAP net income for 2012 and 2013 of $92.9 million and $21.2 million, respectively. Feinstein October 31, 2014 Report at ¶¶ 16-17. This was a significant increase from the net *losses* originally reported for 2010 and 2011 of $36.95 million and $23.79 million. *Id.* Thus, an investor purchasing in 2012 would have been under the impression that Avid's net income was increasing, which would inflate the stock price. Following the restatement, the Company's true net income for 2011 was disclosed to be $226.4 million, revealing that the Company's net income in 2012 and 2013 was actually a significant decline from prior periods. *Id.*

originally reported total stockholders' equity of $443.1 million, $426.6 million and $417.0 million, respectively. *Id.* at ¶ 21. The restatement revealed that, in truth, there existed a total stockholders' *deficit* for 2009, 2010 and 2011 of $148.7 million, $310.3 million and $490.9 million, respectively. *Id.* For 2011 alone, the Company overstated total stockholders' equity by almost *$1 billion*. Defendants also misrepresented the effectiveness of the Company's internal controls and honesty of management throughout the Class Period (including 2011), admitting only later that there existed "material weaknesses", rendering the internal controls ineffective. *See id* at ¶¶ 23-29.[2]

In sum, Defendants' "cherry-picking" of a single metric in a single year to proclaim that no inflation existed ignores the bigger picture, and the impact that their multi-year fraud had upon all Class members.

## II.      COMMON QUESTIONS PREDOMINATE

### A.      *Basic*'s Presumption of Reliance Is Rebutted Only if Defendants Carry Their Burden of Proving Zero Price Impact as a "Matter of Law."

In *Halliburton II,* the Supreme Court held that, once a plaintiff in a federal securities fraud class action has established the presumption of reliance through market efficiency, the defendant may rebut the presumption through "evidence showing that the alleged misrepresentation did not

---

[2] Defendants' assertion that only future cash flow impacts the price of a stock is also refuted by Dr. Feinstein, who concludes that *many* factors impact a company's stock price. *See infra* at 14. Moreover, such a theory is refuted by nearly every published analyst and rating report, which focus on a Company's revenues and reported earnings, key metrics which were manipulated as a result of Defendants' conduct. *See Financial Reporting an Accounting Revolution*, 3rd ed., William H. Beaver, 1998, p. 38 ("No other figure in the financial statements receives more attention by the investment community than earnings per share. The relationship between accounting earnings and security prices is probably the single most important relationship in security analysis, and its prominence is reflected in the attention given to price-earnings ratios."); *Earnings Management to Exceed Thresholds*, Francois Degeorge, Jayendu Patel, and Richard Zeckhauser, *Journal of Business*, p. 1. ("Analysts, investors, senior executives, and board of directors consider earnings the single most important item in the financial reports issued by publicly held firms.").

actually affect the stock's market price . . . ." 134 S.Ct. at 2416. In so doing, the Court expressly refused to place the burden of establishing price impact on plaintiffs at class certification. *Id.* at 2414 ("By requiring plaintiffs to prove price impact directly, Halliburton's proposal would take away the first constituent presumption.").

Defendants' burden of proving zero price impact is not simply a burden of production, but also persuasion. "The *Basic* presumption . . . provides an alternative means of ***satisfying*** [reliance]." *Id*. at 2412 (emphasis added). Once plaintiffs establish the prerequisites for the *Basic* presumption, their burden of persuasion is satisfied. *Id*. ("*Basic* . . . establishes that a plaintiff ***satisfies*** [the burden of proving predominance under Rule 23] by proving the prerequisites for invoking the presumption—namely, publicity, materiality, market efficiency, and market timing. The burden of proving ***those prerequisites*** still rests with plaintiffs . . . .") (emphasis added). Once market efficiency is established, the burden of persuasion then shifts to defendants to prove that the misrepresentations at issue had zero impact on the stock price. *Id*. at 2414 ("Halliburton contends that defendants should at least be allowed to defeat the presumption at the class certification stage through evidence that the misrepresentation did not in fact affect the stock price. We agree."). *See also id* at 2417 (Ginsburg J., concurring) ("[T]he Court recognizes that it is incumbent upon the defendant to show the absence of price impact. The Court's judgment, therefore, should impose no heavy toll on securities-fraud plaintiffs with tenable claims.") (internal citations omitted); *id*. at 2424 (Thomas, J., dissenting) ("[I]n practice, the so-called 'rebuttable presumption' is largely irrebuttable."); *McIntire v. China MediaExpress Holdings, Inc.*, No. 11-CV-0804 VM, 2014 WL 4049896, at *13 (S.D.N.Y. Aug. 15, 2014) ("The defendant bears the burden to prove a lack of price impact.") (collecting cases); *Local 703, I.B. of T. Grocery and Food Employees Welfare Fund v. Regions Financial Corp.*, No. CV 10-J-2847-S, slip op. at 17-20 (N.D. Ala. Nov. 29, 2014)

(certifying class action and holding that the defendant failed to carry its burden of proving lack of price impact).

At trial, once a plaintiff establishes the presumption of reliance, the burden of persuasion shifts to the defendant to rebut the presumption by demonstrating that the "alleged misrepresentation or omission did not affect the market price of the security," which a defendant must do by a "preponderance of the evidence." Manual of Model Civil Jury Instruction for the Ninth Circuit § 18.5; *see also* Eleventh Circuit Pattern Jury Instruction (Civil Cases) § 4.2. However, because a ruling of no price impact by the court at class certification would extinguish Lead Plaintiff's claim, taking it away from the jury,[3] the Court may only make such a ruling if the evidence requires such a result "as a matter of law."[4]

Here, Defendants' attempt to rebut the presumption of reliance can be rejected out-of-hand because Defendants' arguments are premised on the incorrect assumption that it is *Lead Plaintiff's* burden at class certification to prove price impact. *See* Avid Br. at 8 (nor does "[Plaintiff's] evidence of price impact stand up to scrutiny…"); *id.* at 17 ("[Plaintiff's] price impact argument fails…"). The

---

[3] The Supreme Court in *Amgen Inc. v. Conn. Ret. Plans & Trust Funds* addressed this same issue as it pertains to another "indispensable" element of a Rule 10b-5 claim, materiality: "A failure of proof on the issue of materiality [at the class certification stage] . . . not only precludes a plaintiff from invoking the fraud-on-the-market presumption of classwide reliance; it also ***establishes as a matter of law*** that the plaintiff cannot prevail on the merits of her Rule 10b-5 claim . . . . While the failure of common, classwide proof on the issues of market efficiency and publicity leaves open the prospect of individualized proof of reliance, the failure of common proof on the issue of materiality ends the case for the class and for all individuals alleged to compose the class." 133 S.Ct. 1184, 1199 (2013) (emphasis added).

[4] *See, e.g.*, Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); Fed. R. Civ. P. 50(a) (At any time prior to submitting the case to the jury, the court may resolve and issue against a party or grant a motion for judgment as a matter of law only if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."); Fed. R. Civ. P. 50(b) (same, but subsequent to jury verdict).

burden rests squarely on Defendants.  Having introduced no evidence of zero price impact, they

failed to meet it.  Instead, Defendants resort to nit-picking Lead Plaintiff's theory of liability and

speculating as to loss causation. Such attacks, which require a deep dive into the merits of Lead

Plaintiff's claims and do not impact the predominance of common issues, are inappropriate at class

certification.  Moreover, the significant factual disputes between the parties' experts on these issues

forecloses any ruling in Defendants' favor "as a matter of law" (or even by a preponderance of the

evidence).  *See In re Credit Suisse-AOL Sec. Litig.*, No. 02-cv-12146, 2011 WL 3813204, at \*5 (D.

Mass. Aug. 26, 2011) (denying summary judgment in securities case with competing expert reports

opining on loss causation issues).

### B.  Defendants Have Failed To Carry Their Burden of Proving Lack of Price Impact In Order to Defeat *Basic*'s Presumption of Reliance.

This case is a textbook example of a fraud-on-the market securities action appropriate for

class certification. Lead Plaintiff presented conclusive evidence that Avid stock traded in an efficient

market during the Class Period. *See* Doc. #79-1 (Steven P. Feinstein, Ph.D., CFA, Report on Market

Efficiency ("Market Efficiency Report")) at ¶¶ 168-172. Defendants do not contest this fact. Lead

Plaintiff presented conclusive evidence that the false reports of revenues issued throughout the Class

Period caused statistically significant price increases in Avid stock. *Id*. at ¶¶ 101, 118-119 and

Exhibit 7. Defendants do not contest this fact. Lead Plaintiff also presented conclusive evidence that

the alleged corrective disclosure on February 25, 2013 resulted in a statistically significant decline in

Avid stock price. *Id*. at ¶¶ 156-160. Defendants do not contest this fact. Thus, while Lead Plaintiff

only has the burden of demonstrating market efficiency to be entitled to *Basic*'s presumption of

reliance, Lead Plaintiff also demonstrated that the alleged misrepresentations impacted the price of

Avid stock both upon their issuance *and* upon the revelation of the fraud. *See McIntire*, 2014 WL

4049896, at *13 (stating that price impact can be demonstrated *either* at the time of the misrepresentation *or* following the corrective disclosure).

Defendants nevertheless argue that in *theory* cash flow neutral misrepresentations of the kind at issue here should not impact the price of Avid's stock and that, because the stock price decline following the February 25, 2013 corrective disclosure was consistent with delayed filings from other companies, the decline should be attributed to some other aspect of the announcement. Avid Br. at 15. This Court has already ruled that Lead Plaintiff adequately alleged all elements of securities fraud. Defendants' belated challenge is an attack on loss causation, which the Supreme Court held is inappropriate at class certification. *Halliburton I*, 131 S. Ct. at 2181.

Moreover, Defendants' theoretical speculation of why the price impact from the February 25, 2013 corrective disclosure occurred is simply not a basis to rebut the presumption of reliance under *Halliburton II*. The recent decision in *Aranaz v. Catalyst Pharm. Partners Inc.*, No. 13-cv-23878, 2014 WL 4814352 (S.D. Fla. Sept. 29, 2014) is instructive. Conceding that the alleged misrepresentations and corrective disclosures coincided with statistically significant price movements, the *Aranaz* defendants attempted to rebut the presumption of reliance by presenting expert evidence that (1) because the corrective information had been disclosed previously, economic theory precluded a finding of price impact; and (2) the price increase following the alleged misstatement was consistent with other non-fraud related announcements and the decline following the corrective disclosure was attributable to non-fraud aspects of the disclosure. *Id*. at *10-12. Certifying the class, the court held that these arguments – which do not contest the existence of a price impact but, rather, only argue why the alleged misstatements could not have caused any portion of the resulting decline – are inappropriate at class certification. Specifically, the court found that evidence that the price impact was "consistent with" a non-fraud explanation is not enough to carry

defendants' burden.   *Id*. at *12.  Rather, defendants must establish "[t]hat the alleged misrepresentation did not contribute ***at all*** to the 42% spike in the price of Catalyst common stock." *Id*. (emphasis added). The court concluded that, where "all agree that the publications containing the misrepresentation and its revelation respectively caused those price swings, … ***proving an absence of price impact seems exceedingly difficult, especially at the class certification stage.***" *Id*. at *13 (emphasis added).  In this instance, Defendants bear the burden of demonstrating that none of the statistically significant price increases during the Class Period or the declines following the February 25 and March 19, 2013 disclosures had any relationship to Plaintiffs allegations—a nearly impossible task.  *See Regions Financial Corp.*, No. CV 10-J-2847-S, slip op. at 17-218 (holding that the fact that the price decline following the alleged corrective disclosure was not "statistically significant" was insufficient to carry defendant's burden of proving zero price impact).

Rather than meet Lead Plaintiff's theory of liability head on, Defendants argue that the Court should ignore the February 25, 2013 corrective disclosure because it only announced an investigation, the full import of which was not disclosed until the Company's final restatement announcement on September 12, 2014. Avid Br. at 17.

Courts agree that announcements of investigations are corrective disclosures where, as here, later disclosures verify that wrongdoing did, in fact, occur. *See Pub. Employees Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323-25 (5th Cir. 2014) (collecting cases) ("The district court erred in imposing an overly rigid rule that government investigations can never constitute a corrective disclosure in the absence of a discovery of actual fraud."); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 388 (E.D.N.Y. 2013) (holding that announcement of a government investigation into the precise subject matter which forms the basis of the fraudulent practices at issue can qualify as a partial

9

corrective disclosure for purposes of loss causation).[5]  Indeed, the February 25, 2013 disclosure not only announced an investigation into the very issue that caused the restatement, but also prevented Avid from filing its SEC mandated annual report.   The announcement was the first of many disclosures by the Company regarding the depth of financial manipulations committed by Defendant, resulting in a staggering restatement of nearly $900 million of revenues.

The fact that Avid's stock price increased following the resolution of the restatement— eighteen months after the Class Period—is irrelevant to whether the Avid's stock price was inflated *during* the Class Period. As the Second Circuit recently explained:

> [A] share of stock that has regained its value after a period of decline is not functionally equivalent to an inflated share that has never lost value. This analysis takes two snapshots of the plaintiff's economic situation and equates them without taking into account anything that happened in between . . . .

---

[5] *See also Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 256 (D. Mass. 2006) (class period ends with announcement of informal SEC inquiry); *City of Omaha Police and Fire Ret. Sys. v. LHC Group, Inc.*, No. 6:12-1609, 2013 WL 1100819, at *6-7 (W.D. La. Mar. 15, 2013) (holding that the amended complaint adequately alleged the investigations by the SFC and SEC as corrective disclosures and properly pled loss causation); *In re Apollo Group, Inc. Sec. Litig.*, No. CV-10-1735, 2011 WL 5101787, at *17 (D. Ariz. Oct. 27, 2011) (SEC informal inquiry was corrective disclosure for loss causation); *Police & Fire Ret. Sys. v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 230 (S.D.N.Y. 2009) ("[The SEC investigation] could signal to any astute investor that SafeNet may have failed to properly account for its executive compensation, and the market promptly reacted."); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 203-04 (S.D.N.Y. 2010) ("[T]he SEC investigation was linked to the purportedly fraudulent misconduct, and thus was akin to a corrective disclosure"); *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006) ("Defendants' contention that the announcement of the SEC inquiry did not satisfy *Dura*'s 'revelation of the truth' requirement fails to acknowledge the significance of the market reaction to the February 28, 2005 disclosure."). The cases cited by Defendants (Avid Br. at 16) are inapposite, as each involves a situation in which the results of the investigation were never disclosed or the company was later exonerated. Indeed, as the Ninth Circuit stated in *Loos v. Immersion Corp* (cited by Defendants), "[w]e do not mean to suggest that the announcement of an investigation can never form the basis of a viable loss causation theory. Like the Eleventh Circuit, we merely hold that the announcement of an investigation, '*standing alone and without any subsequent disclosure of actual wrongdoing*, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure.'" 762 F.3d 880, 890 n.3 (9th Cir. 2014) (citation omitted) (emphasis added).

10

*Acticon AG v. China N.E. Petroleum Holdings, Inc.*, 692 F.3d 34, 41 (2d Cir. 2012); *see also Abrams v. MiMedix Group, Inc.*, No. 1:13-cv-3074, 2014 WL 3952923, at *4 (N.D. Ga. Aug. 13, 2014) (post-disclosure stock rebound did not negate loss causation); *North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 788 (M.D. Tenn. 2013) (noting that "bounce back of the stock's value after an initial drop does not preclude a Section 10(b) claim"). Courts have granted class certification under similar situations:

> The factors leading to the ADRs rebound in value after the corrective disclosure is not an issue that is unique to the ADRs that Hawaii bought—it is an issue pertinent to all purchasers of ADRs, and subject to generalized proof. Plaintiffs will have to prove that they purchased their shares at an inflated price, and that post-disclosure, the price rebounded for reasons unrelated to the fraud. This is a merits issue that does not, in this case, overlap with any of the Rule 23 requirements, and is thus inappropriate for consideration at this stage.

*In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 455 (S.D.N.Y. 2013).

Defendants' attempts to rebut the presumption of reliance simply constitute "pot shots" at Lead Plaintiff's theory of loss causation. At best, their arguments will be food for thought for the jury to weigh against the opinions of Lead Plaintiff's experts, but are wholly inappropriate (and insufficient) at the class certification stage. Having failed to prove that the alleged misrepresentations had ***zero*** impact on the stock price of Avid, Defendants' attempted rebuttal must be rejected.

11

C.   **A Fluctuation in the Amount of Inflation in Avid's Stock Price During the Class Period Does Not Defeat *Basic's* Presumption of Reliance.**

Defendants argue that, because the restatement revealed that revenues were originally under-reported in Avid's 2011 annual report, Avid's stock price would have been deflated as a result, rendering the fraud-on-the-market inapplicable to purchases made thereafter. Avid Br. at 10.[6]

Defendants' assertion that Avid's stock price was ever "deflated" below its true value is demonstrably false.  The Company's understatement of revenues by $89 million in 2011 hardly negates the massive total overstatement of revenues of $897.8 million from 2005 through 2011. Feinstein Oct. 31, 2014 Report at ¶ 21.  Basic arithmetic reveals that even if the underreporting of revenues for 2011 deflated Avid's stock price, the vast majority of the inflation introduced from 2005 through 2010 ***remained in the stock price***.[7]  As the Second Circuit recently held:

> So long as the falsehood remains uncorrected, it will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflation to the stock, day after day.

*Carpenters Pension Trust Fund of St. Louis*, 750 F.3d at 234 (citations omitted) (reversing district court, which found that inflation introduced by prior financial statements dissipated once those financials became "stale").   As Defendants themselves admit, the link between the misrepresentations and the price paid by Lead Plaintiff is severed only by "provid[ing] evidence that

---

[6] Significantly, Defendants' argument is wholly inapplicable to purchases of Avid securities in 2011 or prior—because the Company did not publish its "deflated" 2011 revenues until February 29, 2012.  Thus, any investor that purchased Avid securities prior to that date was purchasing pursuant to the Company's 2010 & 2009 10-K's—documents which Defendants acknowledge inflated the share price of Avid stock.

[7] Moreover, the additional revenues recognized in 2011 following the restatement came from revenues prematurely recognized in prior years being moved forward to 2011. Feinstein Oct. 31, 2014 Report at ¶ 15. Therefore, these revenues would have been previously incorporated into Avid's inflated stock price, and does not equate with a reduction of price inflation.

the misstatements and omissions did not artificially inflate the price." Avid Br. at 10 (citation omitted). It is undeniable that Avid's stock was inflated by Defendants' misrepresentations. Fluctuations in that inflation during the Class Period are merely issues of damages and do not rebut the fraud-on-the-market presumption of reliance. *See infra* at 15-17.[8]

Regardless, even when viewed in isolation, Avid's 2011 annual report still provided a falsely positive view of the Company's condition. It falsely represented that revenues had steadily increased over the years and would continue to do so when, in truth, management had been "smoothing earnings." The restatement revealed that following 2011, the Company would "experience significant declines in revenues, deferred revenues and revenue backlog in the coming years." Moreover, stockholders' equity for 2011 was inflated by almost $1 billion as a result of the Company falsely reporting a $490.9 million deficit as a $417.0 million surplus.

Defendants also entirely ignore the fact that the market does not price stock just on earnings, but also upon reliability and credibility of management. *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 237(2d Cir. 2000) (Winter, J. dissenting) (finding that, had the truth been told, the plaintiffs would have realized management's lack of credibility so that consequences of the dishonesty are within the zone of proximate cause); a*ccord* Donald C. Langevoort, Basi(2009)c" \s

---

[8] The cases relied on by Defendants (Avid Br. at 12-13, n. 10) are all out-of-circuit, non-class certification cases that predate the Second Circuit's decision in *Barclays*. Indeed, *Seagate Tech. II Sec. Litig.*, 843F. Supp. 1341 (N.D. Cal. 1994), is over 20 years old and has been "widely discredited." *Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 377 (S.D.N.Y. 2000); *see also In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 70 (S.D.N.Y. 1999). *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670 (D.N.J. 2006), is a non-binding decision that is easily distinguishable. *Intelligroup* involved a motion to dismiss, not class certification where the complaint's allegations already have been found sufficient. *Id.* at 674. Moreover, the plaintiffs in that case only claimed that the Company overstated its net income. *Id.* at 685-86. Finally, the court dismissed the claims with leave to amend based on loss causation, not the net effect of any restatement—the court held loss causation was not pleaded where stock price dropped by $0.52 from $1.65 on the day of corrective disclosure, but then recovered "within the next five days back to $1.60." *Id.* at 703-05.

"WSFTA_62fe84aa81304e718b275ce42a2128f7" \c 13 Basic *at Twenty: Rethinking Fraud on the Market*, 2009 Wis. L. Rev. 151-198, n.140 (2009); Frederick C. Dunbar & Arun Sen, *Counterfactual Keys to Causation and Damages in Shareholder Class-Action Lawsuits*, 2009 Wis. L. Rev. 199, 237 (2009).

Indeed, the ramifications of financial fraud extend well beyond the direct dollar amount of the fraud, causing further loss from the damage to a company's reputation. Lieberman Decl., Ex. B (Rebuttal Report of Steven P. Feinstein, PH.D., CFA ("Feinstein Rebuttal Report")) at ¶¶ 18-27:

> Risk/uncertainty likely increases and future prospects may well decrease when management integrity and competence are called into question.
>
> ***
>
> Because fraud means intentional, non-GAAP financial reporting, it indicates a lack of management integrity that we expect to be associated with a more negative stock price reaction, incremental to any other impacts from revising reported results. This may be due to an increase in the discount rate because fraud creates uncertainty about the reliability and credibility of management representations, which increases the perceived information asymmetry between management and stockholders.
>
> ***
>
> Our results suggest a greater investor concern over restatements that carry negative implications for management integrity than those due to more technical issues.

*Id*. at ¶ 25 (quoting Zoe-Vonna Palmrose, Vernon J. Richardson, and Susan Scholz, *Determinants of Market Reactions to Restatement Announcements*, J. of Accounting & Econ. (2004).  It has been estimated that "for each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $2.71, due to reputation loss." Jonathan Karpoff, D. Scott Lee, and Gerald Martin, *The Cost to Firms of Cooking the Books,* Journal of Financial and Quantitative Analysis, 2008, p. 581.  Here, investors in 2011 undoubtedly would have paid significantly less for Avid stock if they had known that the Company's internal controls were non-existent, stockers' equity was negative, future revenues would decline dramatically and that management had been intentionally misreporting revenues since at least 2005 – all of which impact the riskiness of future cash flows.  Feinstein Rebuttal Report at ¶¶ 19-27.

14

Ultimately, the precise amount of inflation on a given day is irrelevant at class certification because the alleged misstatements would have affected the entire market in the same manner, permitting resolution of the issue on a class-wide basis. *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) ("[T]he class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions.").

### III.   LEAD PLAINTIFF'S PURCHASE DATES DO NOT RENDER HIM ATYPICAL.

The typicality requirement is "intended to protect plaintiff class—not to shield defendants from a potentially meritorious suit." *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200 (S.D.N.Y. 1992). Therefore, the rule barring certification of a plaintiff subject to a unique defense "has generally been applied only where a full defense is available against an individual plaintiff's action." *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013, 2006 WL 330113, at *9 (S.D.N.Y. Feb. 14, 2006) (plaintiff that sold all its shares prior to full revelation of the truth was typical because one or more disclosures occurred prior to its final sale). "[E]ven in cases where a unique defense might exist, a plaintiff subject to a unique defense is not an appropriate class representative only if that unique defense might draw the focus of the litigation away from the common legal or factual issues." *In re Ashanti Goldfields Secs. Litig.*, No. CV 00-0717, 2004 WL 626810, at *13 (E.D.N.Y. Mar. 30, 2004) (quotation omitted).

Defendants argue that Lead Plaintiff is not typical because Avid stock was not inflated on the days he purchased, resulting in no loss to Lead Plaintiff. Avid Br. at 18-19. Defendants have provided no evidence of negative inflation on any day of the Class Period. Even if they did, such evidence would not be "unique" to Lead Plaintiff, but in fact be common to all Class members who purchased on that date. *See In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825, 2008 WL

15

820015, at *3 (E.D.N.Y. Mar. 24, 2008) (finding that plaintiff who only purchased after partial disclosures was not subject to a unique defense because "[t]here are undoubtedly many members of the class of plaintiffs who, like [the lead plaintiff], purchased shares of [the company] only after the [partial disclosures]").[9]

In yet another variation of the same argument, Defendants speculate that the timing of Lead Plaintiff's purchases could create conflicts over damages. Avid Br. at 19-20. However, Defendants presented no evidence demonstrating an actual conflict between Lead Plaintiff and other Class members. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (A conflict that will prevent class certification must be "fundamental"—"speculative conflicts should be disregarded at the class certification stage." (citations omitted)); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 276 (S.D.N.Y. 2008) ("[C]lass certification is defeated only if such conflicts are actual—as opposed to merely speculative."). Even if Defendants had presented such evidence, "it is

---

[9] *See Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 263 (D. Mass 2005) (certifying class of stock purchasers despite "the presence within the class of individuals who bought Razorfish stock at different points in time"); *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 275 F.R.D. 382, 390 (D. Mass. 2011) ("[C]ourts have certified classes … despite the fact that class members may have purchased or sold stock at different times 'so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security.'") (citations omitted). *See also In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431, 1999 WL 1021819, at *6 (E.D.N.Y. Apr. 27, 1999) (finding that plaintiff's purchase in the last two days of the class period after partial corrective disclosures did not create a unique reliance defense and stating that "there is no reason to believe that a defense predicated on his purchase of options late in the class period will divert the trial from the main issues"). *See also Dietrich v. Bauer*, 192 F.R.D. 119, 125 n.1 (S.D.N.Y. 2000) (finding proposed class representative satisfied typicality despite purchasing stock after partial curative disclosures where the disclosures did not concede the existence of the fraud); *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 609-10 (S.D. Ohio 2003) (holding that purchases after partial curative disclosures do not render a class representative atypical); *In re Bearingpoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 539-40 (E.D. Va. 2006) (rejecting argument that plaintiff, who purchased only after several internal control corrective disclosures, was subject to an unique reliance defense); *Lawrence v. Philip Morris* Co., No. 94-CV-1494, 1999 WL 51845, at *5-6 (E.D.N.Y. Jan. 9, 1999) (rejecting defendants' argument that because plaintiff did not purchase until after a partial disclosure "[plaintiff's] purchase will thus be subject to the unique defense that he was not the victim of any fraud, since the company alleges it had made adequate disclosure the day before his purchase").

well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010). Specifically, "conflict between early and late purchasers will not be sufficient to deny a motion for class certification if all the misrepresentations relied upon are interrelated or part of a common scheme to defraud." *Michaels v. Ambassador Group, Inc.*, 110 F.R.D. 84, 89-90 (E.D.N.Y. 1986); *accord In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 70 (S.D.N.Y. 1999) ("The chief role of price inflation remains its function in determining each plaintiff's damages. The common questions with respect to whether misleading statements or omissions were made, whether such statements were material, and whether they were made with scienter, bind class members with more force than the varying questions related to price inflation drive them apart.")[10]

Even if the publication of Avid's 2011 annual report did reduce the inflation in Avid's stock price (it did not), and even if such reduced inflation was a basis for finding a lead plaintiff atypical (it is not), it would still be of no moment because Lead Plaintiff purchased 1,289 of his 1,836 shares *prior to the publication of the 2011 annual report on February 29, 2012.* Lieberman Decl., Ex. C (Certification of Michael Courtney) Lead Plaintiff is the ideal candidate to represent the Class.

## IV.        THE CLASS DEFINITION IS APPROPRIATE.

Though E&Y argues that the class period must begin no later than the date of its first audit opinion, the class is properly defined by its membership of individuals seeking to recover damages—

---

[10] The only case relied on by Defendants, *In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 401-03 (D. Mass. 2007), is wholly inapposite as it involved a plaintiff that, during the class period, sold six times as many shares as he purchased and the court was able to actually calculate that the plaintiff made a profit during the class period. Here, Defendants have not established that Lead Plaintiff did not suffer any loss as a result of his multiple purchases during the Class Period. Regardless, such an argument would apply to the thousands of similarly-situated Class members. Defendants' reliance on *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298 (S.D.N.Y. 2010) is misplaced as the court found that the plaintiff was typical and granted class certification.

not by the extent of each Defendants' liability. *See, e.g.*, *In re Tyco Int'l, Ltd.*, 236 F.R.D. 62, 70 (D.N.H. 2006) (refusing to split class into subclasses, reasoning that "[t]he lead plaintiffs are pursuing a litigation strategy that is predicated on the theory that Tyco is liable for the wrongdoing of the individual defendants and that PwC aided the individual defendants in committing the fraud. They thus have a strong interest in demonstrating that all of the defendants are liable for damages."); *Natchiotches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 269 (D. Mass. 2008) (explaining that the court may divide the class into subclasses where conflicts *between class members* arise) (emphasis added). Moreover, with respect to any discrete damages issues, "[i]f it becomes necessary later on, subclasses can be created to address the different damages calculations, if any." *In re Evergreen Ultra Short Opportunities*, 275 F.R.D. at 392 (citations omitted). E&Y raises no issue which would create conflicts among the Class members requiring creation of any subclass at this point in the litigation.

E&Y also argues that the class period must end no later than February 25, 2013—but that is not the last alleged corrective disclosure in the Complaint. Contrary to E&Y's reasoning, a statistically significant stock drop on an individual date following a corrective disclosure is ***not*** the only or even the preferred method of demonstrating loss causation. In fact, the Supreme Court has acknowledged that the relevant truth can "leak out," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005), followed by market reactions which were not necessarily perceptible on a statistically significant basis. *See id.* at 344-46; *see also In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 711 (S.D. Tex. 2006) ("[T]he *Dura* Court only suggested that the plaintiff's economic loss may occur as the "relevant truth begins to leak out" or "after the truth makes its way into the market place"); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2012 WL 4343223, at *2 (N.D. Ill. Sept. 21, 2012) (acknowledging the fundamental underpinnings of the leakage theory and

18

declining to force plaintiffs to approach loss causation on a misstatement-by-misstatement basis). Here, information continued to leak into the market, and Class members continued to be damaged by the fraud beyond the artificial end date chosen by E&Y—damages for which the class rightfully will seek compensation. *Regions Financial Corp.*, No. CV 10-J-2847-S, slip op. at 18 ("Whether this tumble [in stock price] was due to defendants' corrective disclosures . . . is an ultimate question in this action, and properly reserved for a jury to decide.").

Finally, E&Y argues that investors who held their shares until after the restatement have no damages. However, as discussed above, the Second Circuit recently explained in *China North East* that post-disclosure stock price increases do not offset the effects of the fraud alleged. 692 F.3d at 41.

## CONCLUSION

For the reasons stated herein, Lead Plaintiff respectfully requests that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing the Lead Plaintiff as the Class Representative; (3) appointing Lead Counsel as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

DATED: November 20, 2014                    Respectfully submitted,

                                            */s/ Jeremy A. Lieberman*
                                            Jeremy A. Lieberman

                                            **POMERANTZ LLP**
                                            MARC I. GROSS
                                            JEREMY A. LIEBERMAN
                                            STAR M. TYNER
                                            600 Third Avenue, 20th Floor
                                            New York, NY 10016
                                            Telephone: 212/661-1100
                                            212/661-8665 (fax)

**POMERANTZ LLP**
PATRICK V. DAHLSTROM
Ten South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312/377-1181
312/377-1184 (fax)

**ROBBINS GELLER RUDMAN & DOWD
LLP**
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
CHRISTOPHER M. BARRETT
WILLIAM GEDDISH
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

**ROBBINS GELLER RUDMAN & DOWD
LLP**
ANDREW W. HUTTON
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

*Co-Lead Counsel for Lead Plaintiffs*

**HUTCHINGS, BARSAMIAN,
MANDELCORN & ZEYTOONIAN, LLP**
Theodore M. Hess Mahan (BBO #557109)
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: 781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

**SHAPIRO HABER & URMY LLP**
Edward F. Haber (BBO# 215620)
Seaport East
Two Seaport Lane
Boston, MA 02210
Telephone: 617/439-3939
617/439-0134

20

*Liaison Counsel*

**VANOVERBEKE MICHAUD &
TIMMONY, P.C.**
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman