# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL COURTNEY, Individually and On Behalf of All Other Persons Similarly Situated, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br> vs.<br><br>AVID TECHNOLOGY, INC., LOUIS HERNANDEZ, GARY G. GREENFIELD, KENNETH A. SEXTON; and ERNST & YOUNG, LLP,<br><br>      Defendants. | CIVIL ACTION NO. 1:13-CV-10686-WGY<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

REPORT OF

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

October 31, 2014

## TABLE OF CONTENTS

INTRODUCTION AND SCOPE ................................................................................................... 1

CONCLUSIONS ........................................................................................................................... 2

FACTUAL BACKGROUND ......................................................................................................... 2

   About the Company ................................................................................................................ 2

   Original Versus Restated Financial and Accounting Information ............................................ 3

      Net Revenues ................................................................................................................... 3

      Net Losses/Gains ............................................................................................................. 6

      Accumulated Deficit ........................................................................................................ 7

      Total Stockholders' Equity .............................................................................................. 8

   How the Deficiency in Internal Controls and the Failure to Correctly Recognize Revenue
   Caused Losses to Plaintiffs .................................................................................................... 9

LOSS CAUSATION .................................................................................................................... 12

   Company Statements Confirm the Materiality of the Allegations ........................................... 12

   Analyst Commentary and Concerns Indicate that the Subject Matter of Plaintiffs' Allegations
   Constituted Important Valuation-Relevant Information. ......................................................... 14

   Financial Principles Confirm the Materiality of the Allegations ............................................. 17

   Reputation Effect and Negative Valuation Impact of Restatements ....................................... 18

EMPIRICAL CONFIRMATION OF LOSS CAUSATION ......................................................... 20

   Event Study .......................................................................................................................... 20

      Disclosure Event ........................................................................................................... 21

      Isolating the Impact of Company-Specific Information .................................................. 21

      *t*-test ............................................................................................................................ 22

   Event Study Analysis: 25 February 2013 ............................................................................... 23

   Accounting for Potentially Confounding Information ............................................................. 23

ARTIFICIAL INFLATION RIBBON .......................................................................................... 24

   Reduction of Inflation on 25 February 2013 Due to Disclosure of Material Weaknesses in the
   Internal Controls and Thus the Problems of Correctly Recognizing Revenue ........................ 25

PER SHARE DAMAGE FORMULA ........................................................................................... 26

LIMITING FACTORS AND OTHER ASSUMPTIONS ............................................................... 28

## INTRODUCTION AND SCOPE

1.  In my expert report dated 15 September 2014 ("Feinstein Report" or my "September Report"), I concluded that Avid Technology, Inc. ("Avid" or the "Company") common stock traded in an efficient market over the course of the proposed Class Period, 23 October 2008 to 20 March 2013 ("Class Period").[1]

2.  Subsequently, I was asked by Pomerantz LLP and Robbins Geller Rudman & Dowd LLP, counsel for the Plaintiffs, to determine whether investors who purchased Avid common stock during this Class Period suffered losses as a result of the Defendants' alleged misrepresentations described in the Complaint, and to quantify damages sustained, if any, on a per share basis.

3.  This report presents my methodology, findings, and conclusions relating to loss causation and the quantification of per share damages.

4.  Exhibit-1 lists the data and documents I reviewed and relied upon during the course of this engagement in addition to those cited in my September Report. My credentials and compensation are presented in my September Report, as are prior testimonies provided as of the date of that report. Testimony I have provided since the submission of my first report is identified in Exhibit-2.

5.  I understand that discovery is ongoing in this case. I reserve the right, in my sole discretion, to make any corrections or additions to my report, and to modify my opinion, should any new or additional information become available.

---

[1] Unless otherwise indicated, capitalized terms used herein have the meaning ascribed to them in the Feinstein Report. The proposed Class Period is from the Class Action Complaint filed 16 September 2013 ("Complaint") and the Memorandum and Order, dated 27 June 2014.

## <u>CONCLUSIONS</u>

6.     Event study analysis, which considered and accounted for potentially confounding information and exogenous factors, proves that the alleged misrepresentations, made by the omission of material facts, caused the price of Avid stock to be artificially inflated. The corrective disclosure caused the inflation to dissipate, which in turn caused the stock price drop and investor losses.

7.     The Company's announcement on 25 February 2013 was a corrective disclosure, which caused the dissipation of artificial inflation totaling $0.54 per share.

8.     As a result of the Defendants' misrepresentations and omissions related to the material weaknesses in Avid's internal controls, and thus the problems of correctly recognizing revenue and the impact on Avid's reputation, the market price of Avid stock was artificially inflated by $0.54 per share from 23 October 2008 through 22 February 2013.

## <u>FACTUAL BACKGROUND</u>

### <u>About the Company</u>

9.     Throughout the Class Period, Avid was a technology company that provided "digital media content-creation products and solutions for audio, film, video, and broadcast professionals, as well as artists and creative enthusiasts."[2]  The Company provided "a broad range of software and hardware products and solutions, as well as service offerings, to address the diverse needs, skills and sophistication levels" found within their three market segments: Media Enterprises, Professionals and Post, and Creative Enthusiasts.[3]  Describing its customer service and support offerings, the Company stated:

> "Depending on the solution, customers may choose from a variety of support offerings, including telephone and online technical support, on-site assistance, hardware replacement and extended warranty, and software upgrades."
> **Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, p. 6.**

---

[2] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, pp. 1-2.
[3] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, pp. 1-2.

10.     On 25 February 2013, Avid disclosed that it was unable to timely report its financial results
        for the fourth quarter of 2012.[4]  On 19 March 2013 the Company announced that it would
        be unable to file its 10-K for the year ended 31 December 2012 as it needed additional time
        primarily to evaluate its accounting treatment of Software Updates.[5]  This was closely
        followed on 21 March 2013 with the disclosure that the Company had received notification
        from the NASDAQ Listing Qualifications Department indicating that the Company was no
        longer in compliance with the exchange's listing rules that require timely filing of periodic
        reports with the SEC.[6]  On 21 May 2013, the Company added that past financial statements
        could not be relied upon.[7]  Finally, on 12 September 2014 the Company issued its SEC
        Form 10-K, reporting financial and accounting information for the fiscal years ended 31
        December 2012 and 31 December 2013, as well as restated financial and accounting
        information for fiscal years 2005-2011.[8] Below is a comparison of critical financial and
        accounting information, which management and accountants used to describe the
        performance of Avid, as it was originally stated, and as it was restated.

**Original Versus Restated Financial and Accounting Information**

Net Revenues

11.     The Company has a fiscal year end (FYE) of 31 December.  For FYEs 2009, 2010 and
        2011, the Company originally reported net revenues of $629.0 million, $678.52 million and

---

[4] "Avid today announced that it is postponing its fourth quarter 2012 earnings release and investor conference call,
previously scheduled for Tuesday, February 26, 2013 to provide additional time for the Company to evaluate its
current and historical accounting treatment related to bug fixes, upgrades and enhancements to certain products
which the Company has provided to certain customers. The need to evaluate the accounting treatment arose during
the Company's normal review of its financial results for the fourth quarter and full year 2012." Avid Technology,
Inc. Form 8-K, filed 25 February 2013, p. 1. Also see Complaint, ¶4, ¶116, and ¶140.
[5] In the filing it was stated that Avid was, "… currently unable to estimate the time needed to complete its
evaluation, predict the materiality of any adjustments that could be required, and the impact, if any, on prior
periods." Avid Technology, Inc., Form NT 10-K, filed 19 March 2013.
[6] "Avid Announces Receipt of Anticipated NASDAQ Letter," *Business Wire*, Company press release, 21 March
2013, 4:10 PM.
[7] "The Company management has evaluated the potential impact of its findings on the Company's prior period
financial statements and concluded that the Company's unaudited interim consolidated financial statements for the
quarterly periods ended (i) September 30, 2012 and 2011, (ii) June 30, 2012 and 2011, and (iii) March 31, 2012 and
2011, as well as its audited consolidated financial statements for the years ended December 31, 2011, 2010 and 2009
should no longer be relied upon." Avid Technology, Inc. Form 8-K, filed 21 May 2013, p. 1. Also see Complaint,
¶4, ¶47, ¶124, and ¶125.
[8] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014.

$677.94 million, respectively.[9] In September 2014, the Company restated its revenues for 2009 through 2011, with restated revenues of $506.5 million, $403.5 million, and $766.8 million, respectively.  The changes in revenue are summarized (in millions of dollars):

| Fiscal Year End | As Originally Reported[10] | As Restated[11] | Amount Understated (Overstated) |
|---|---|---|---|
| 31 December 2009 | $629.0 | $506.5 | ($122.5) |
| 31 December 2010 | $678.5 | $403.5 | ($275.0) |
| 31 December 2011 | $677.9 | $766.8 | $88.9 |

12.    In aggregate, revenues for 2009 and 2010 were overstated by $297.5 million prior to the restatement, while 2011 revenues were understated by $88.9 million.  FYEs 2012 and 2013 revenues were not restated, and were $635.7 million and $563.4 million, respectively, when both were presented in 12 September 2014 when the Company filed its SEC Form 10-K.[12]

13.    Although revenues were restated for the period of 2005 to 2011, the Company only reported the restated revenues for FYEs 2009, 2010, 2011 and the first three quarters for FYE 2012.[13] The Company stated:

---

[9] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, p. 2 and p. 51.

[10] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, p. 21.

[11] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 28.

[12] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 28. In the SEC filing (p. 37), the Company stated: "Because we had not been able to establish VSOE of fair value for Implied Maintenance Release PCS, as described further below, substantially all revenue arrangements prior to January 1, 2011 were recognized on a ratable basis over the service period of Implied Maintenance Release PCS. Subsequent to January 1, 2011 and the adoption of ASU No. 2009-14, we determine a relative selling price for all elements of the arrangement through the use of BESP, as VSOE and TPE are typically not available, resulting in revenue recognition upon delivery of arrangement consideration attributable to product revenue, provided all other criteria for revenue recognition are met, and revenue recognition of Implied Maintenance Release PCS and other service and support elements over time as services are rendered. As a result of the adoption of these standards, we recorded increased revenues and net income of approximately $300 million for the year ended December 31, 2011 (Restated) as compared with results that would have been recorded under the prior accounting standards."

[13] "We have not filed and do not intend to file amendments to any of our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatements or corrections of our financial statements. Accordingly, investors and others should rely only on the financial information and other disclosures regarding the Restated Periods in this Form 10-K, in our Quarterly Reports on Form 10-Q for the quarters ended September 30, 2013, June 30, 2013 and March 31, 2013, or in future filings with the SEC (as applicable), and not on any previously issued or filed reports, earnings releases or similar communications relating to these periods." Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. vii.

"The restatement also affects periods prior to the year ended December 31, 2011, and the cumulative effects of the restatement have been reflected as prior period adjustments to the 2011 opening balance of accumulated deficit."

**Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. vii and p. 32.**

14.    In explaining why they needed to restate financial and accounting information, the

Company stated:

"In early 2013, during the course of the review of our financial results for the fourth quarter and full year of 2012, we identified a historical practice of Avid making available, at no charge to our customers, minor feature and/or compatibility enhancements as well as bug fixes on a when-and-if-available basis, collectively the Software Updates, that we have concluded meet the definition of post-contract customer support, or PCS, under U.S. generally accepted accounting principles, or GAAP. The business practice of providing Software Updates at no charge for many of our products creates an implicit obligation and an additional undelivered element for each impacted arrangement, which we refer to as Implied Maintenance Release PCS. **Our identification of this additional undelivered element in substantially all of our customer arrangements has a significant impact on our historical revenue recognition policies because this element had not been previously accounted for in any period.**"[14]

**Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. v. (emphasis added).**

15.    The level and rate of growth of revenues that were originally reported, and that (as

discussed below) are critical factors to analysts and investors evaluating the Company,

were modified with the restatement.  The restated revenues in FYEs 2005-2010 were

reduced and moved into FYE 2011, causing a spike in 2011 revenues.  This spike did not

---

[14] "The failure to identify and account for the existence of Implied Maintenance Release PCS resulted in errors in the timing of revenue recognition reported in the Company's previously issued consolidated financial statements. Historically, the Company generally recognized revenue upon product shipment or over the period services and post-contract customer support were provided (assuming other revenue recognition conditions were met). As described more fully in the Company's policy for "Revenue Recognition" in Note A, the existence of Implied Maintenance Release PCS in a customer arrangement requires recognition of some or all arrangement consideration, depending on GAAP applicable to the deliverables, over the period of time that the Implied Maintenance Release PCS is delivered, which is after product delivery or services are rendered and is generally several years. The errors in the timing of revenue recognition have been corrected in the restated consolidated financial statements. The significant change in the pattern of revenue recognition also had indirect impacts on revenue related accounts, such as sales return allowances and, as discussed further below, non-revenue accounts such as goodwill, stock-based compensation and income taxes, which have also been restated in the restated consolidated financial statements." Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 75.

exist in the original financial statements and has also led to decreasing revenues and a negative rate of growth in 2012 and 2013.  In explaining why revenues declined from 2011 to 2013, the Company stated:

> "These decreases in revenues from continuing operations were primarily the result of lower amortization of deferred revenues (that is, lower recognition of revenue backlog) attributable to transactions executed on or before December 31, 2010, … As a result of the change in accounting standards, even with consistent or increasing aggregate order values, we will experience significant declines in revenues, deferred revenues and revenue backlog in the coming years as revenue backlog associated with transactions occurring prior to January 1, 2011 decreases each quarter without being replaced by comparable revenue backlog from new transactions. After consideration of this change in accounting standards, there have been no other significant changes in our revenues."
> **Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 34.**

Net Losses/Gains

16.  For 2010 and 2011, the Company originally reported net losses of $37.0 million and $23.8 million, respectively.[15] In the restatement, the Company reported that GAAP net income for 2011 increased to $250.2 million to $226.4 million.  For 2013 and 2012 the Company reported GAAP net income of $21.2 million and $92.9 million, respectively.[16]

17.  The declines in revenue and net income in 2012 and 2013, relative to the restated amounts in 2011, were predominately due to the larger portion of revenue from periods prior to 2011 being amortized in 2011 and 2012 as compared to 2013 due to the restatement and the timing of the recognition of revenues. As mentioned above, although net income was restated for 2005-2011, the Company only reported the restated net income for 2009-2011.[17] The changes in net income are summarized (in millions of dollars):

---

[15] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, p. 2 and p. 51.
[16] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 28.
[17]  Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 75.

| Fiscal Year End | As Originally Reported[18] | As Restated[19] | Amount Understated (Overstated) |
|---|---|---|---|
| 31 December 2009 | ($68.4) | ($49.2) | $19.2 |
| 31 December 2010 | ($37.0) | ($187.6) | ($150.5) |
| 31 December 2011 | ($23.8) | $226.4 | $250.2 |

Accumulated Deficit

18. For 2010 and 2011, the Company originally reported accumulated deficits of $495.3 million and $524.5 million, respectively.[20] In the Company's restatement, the Company reported increased accumulated deficits for 2010 and 2011 of $1,246.3 million and $1,444.8 million, respectively.[21]  The increases in the restated accumulated deficits in 2010 and 2011 by $751.0 million and $920.3 million, respectively, were due to "the cumulative effects of the restatement hav[ing] been reflected as prior period adjustments to the 2011 opening balance of accumulated deficit," which was predominately due to the $897.8 million in revenue recognition adjustments for the period prior 2010.[22]  The increase between 2010 and 2011 was largely due to accounting changes related to revenue recognition and the cumulative-effect adjustments due to adoption of ASU No. 2010-28.

19. For 2012 and 2013 the Company reported accumulated deficits of $1,357.7 million and $1,336.5 million, respectively.[23]

---

[18] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, p. 21.
[19] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p.28.
[20] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, p. 52.
[21] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p.64.
[22] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. vii and p. 32.
[23] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 63.

20.    Further, "[a]s a result of the change in the timing of revenue recognition described above and the resulting increase in deferred revenues" the Company also restated its Goodwill and Stock-Based Compensation.  Further, the Company restated certain financial information based on adjustments to its income tax, a restructuring charge recorded in 2009 and other adjustments.[24]

Total Stockholders' Equity

21.    For FYEs 2009, 2010 and 2011, the Company originally reported total stockholders' equity of $443.1 million, $426.6 million and $417.0 million, respectively.[25] In the restatement, the Company reported total stockholders' *deficit* for FYEs 2009, 2010 and 2011 of $148.7 million, $310.3 million and $490.9 million, respectively.[26]  These decreases in the restated total stockholders' equity, which turned a company with positive book value (i.e., positive equity) into one with negative book value (i.e., a deficit) in 2009, 2010 and 2011 by $591.8 million, $736.9 and $907.9 million, respectively, were due to "the cumulative effects of the restatement hav[ing] been reflected as prior period adjustments to the 2011 opening balance of accumulated deficit," which was predominately due to the $897.8 million in revenue recognition adjustments for the period FYEs 2005 to 2011. The changes in total stockholders' equity into total stockholders' deficit from 2009 to 2011 are summarized below (in millions of dollars):

| Fiscal Year End | As Originally Reported[27] | As Restated[28] | Amount Overstated (Understated) |
|---|---|---|---|
| 31 December 2009 | $443.1 | ($148.7) | ($591.8) |
| 31 December 2010 | $426.6 | ($310.3) | ($736.9) |
| 31 December 2011 | $417.0 | ($490.9) | ($907.9) |

---

[24] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, pp. v, vi, 30, 31 and 75.

[25] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, p. 21.

[26] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p.29.

[27] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, p. 21.

[28] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 28.

22.   In September 2014, the Company reported a total stockholders' deficit of $359.3 million at FYE 2013, which was $776.3 million less than the previously reported total stockholders' equity of (positive) $417.0 million.[29]


**How the Deficiency in Internal Controls and the Failure to Correctly Recognize Revenue Caused Losses to Plaintiffs**

23.   The Company stated its policies with regard to recognition of revenue from post-contractual services (PCS) as follows:

> "For software products, if elements are undelivered at the time of product shipment and provided that we have VSOE [vendor-specific objective evidence] of fair value for the undelivered elements, we defer the fair value of the specified upgrade, product or enhancement and recognize those revenues only upon later delivery or at the time at which the remaining contractual terms relating to the elements have been satisfied. If we cannot establish VSOE for each undelivered element, all revenue is deferred until all elements are delivered …"
> **Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, p. 26.**

24.   Plaintiffs allege that throughout the Class Period:

> "Avid improperly recognized revenues it generated from various software updates, which include, among other things, enhancements, bug fixes and compatibility extensions (collectively, "Software Updates").
>
> …the Company improperly recognized the revenues it generated from various Software Updates, by recognizing said revenues immediately upon the commencement of a licensing agreement with a customer, as opposed to ratably over the term of the contract, as unambiguously provided by Generally Accepted Accounting Principles ('GAAP'). The Company recognized such revenue for the purpose of inflating its financial results, and such recognition violated both GAAP and the Company's own stated policy, which was to "'defer[] the fair value of the specified upgrade, product or enhancement and recognizes those revenues only upon later delivery.'"
> **Complaint, ¶3 and ¶4.**

---

[29] Avid Technology, Inc. Form 10-Q for the Fiscal Quarter Ended 30 September 2012, filed 09 November 2012, p. 29.

25.     Plaintiffs allege that because of material weaknesses in the Company's internal controls the Defendants made misstatements during the Class Period concerning the recognition of revenue on sales of Software Updates and the costs associated with those Software Updates, which in combination led to the overstatement of net income or the understatement of net losses.[30]  These allegations all emanate from material weaknesses in the Company's internal controls.  This was admitted in Avid's most recent SEC Form 10-K:

> "**We have identified control deficiencies that individually and when aggregated represent material weaknesses in our internal control over financial reporting** and have concluded that our internal control over financial reporting and our disclosure controls and procedures were not effective as of December 31, 2013. If we fail to properly remediate these or any future weaknesses or deficiencies or maintain proper and effective internal controls, our ability to produce accurate and timely financial statements could be impaired and our reputation could be harmed, which could **negatively impact our stock price** and damage our business.
>
> We have **concluded that our internal control over financial reporting was not effective** as of December 31, 2013 due to the existence of material weaknesses in such controls, and we have also concluded that our disclosure controls and procedures were not effective as of December 31, 2013 **due to material weaknesses in our internal control over financial reporting. In the second quarter of 2013, we determined that we needed to restate revenue** for millions of customer transactions for interim and annual periods ended during the periods from January 1, 2005 to September 30, 2012 (the Restatement Periods) to correct errors in our historically issued financial statements. In addition, certain other adjustments arose in the Restatement Periods that were deemed material and were adjusted in the restated financial statements for the Restatement Periods. The errors in the misapplication of GAAP over revenue recognition and the other errors identified resulted from several control deficiencies that were in existence during the Restatement Periods and at December 31, 2013, as described in Part II, Item 9A, "Controls and Procedures," of this Annual Report on Form 10-K."
> **Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 11 (emphasis added).**

---

[30] Although there were other adjustments in the restatement, the negative adjustments were predominantly due to the improper recognition of revenue. *See*, Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p.vii.

26.    Plaintiffs further allege that Defendants' omissions of material fact related to the material weaknesses in Avid's internal controls, and thus the problems of correctly recognizing revenue caused the Company's stock price to be artificially inflated throughout the Class Period.[31]  The artificial inflation, which related directly to the material weaknesses in Avid's internal controls and thus the problems of correctly recognizing revenue, was reduced on 25 February 2013 when the Company announced that it was unable to timely report its financial information because it had to evaluate its accounting with respect to revenue recognition.[32]

27.    In fact, since the 25 February 2013 disclosure of the material deficiency in internal controls, the Company has admitted its internal controls have been "significantly changed and enhanced," stating:

> "As discussed in the preceding risk factor, **the processes underlying the preparation of the financial statements contained in this report were extraordinary.** While we expect to continue to rely on these extraordinary processes to prepare our quarterly and annual financial statements during the year ending December 31, 2014, we expect that we will also increasingly rely on our regular financial statement preparation and reporting processes. **While we have significantly changed and enhanced these regular processes (as described elsewhere in this report), as of the filing date of this report, previously identified material weaknesses in our internal control over financial reporting have not have been fully remediated** and we continue to:
> • make changes to our finance organization;
> • adopt new accounting and reporting processes and procedures;
> • enhance our revenue recognition and other existing accounting policies and procedures;
> • introduce new or enhanced accounting systems and processes; and
> • improve our internal control over financial reporting."

---

[31] "As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of Avid shares fell precipitously, as the prior artificial inflation came out of the price of the shares." Complaint, ¶136.

[32] "On February 25, 2013, Avid disclosed that it was unable to timely report its financial results for the fourth quarter of 2012 as it needed additional time 'to evaluate its current and historical accounting treatment related to bug fixes, upgrades and enhancements to certain products which the Company has provided to certain customers.' On this news, the market price of Avid common stock declined precipitously, falling 8.88% and closing at $6.98 per share on February 25, 2013, on unusually high trading volume of more than 500,000 shares trading, more than six times the average daily volume over the preceding ten trading days." Complaint, ¶140.

**Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 12. (Emphasis added.)**

28.    Statements about material weaknesses in internal controls are contrary to public disclosures of Ernst & Young, the Company's outside auditors at the time, which prior to February 25, 2013 concluded that, "[i]n our opinion, Avid Technology, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011."[33]

29.    These statements are also contrary to the Certifications signed in 2011 by Gary G. Greenfield (Chairman of the Board of Directors, Chief Executive Officer and President) and Ken Sexton (Executive Vice President, Chief Financial Officer and Chief Administrative Officer), which state, in pertinent part:

> "The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information …"
> **Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, Exhibits 31.1 and 31.2.**

## LOSS CAUSATION

30.    Over the course of the Class Period, the Defendants' alleged misrepresentations of material facts caused the price of Avid stock to be artificially inflated.  This conclusion is based on a careful analysis of Company statements, analyst commentary, generally accepted principles of valuation, and an event study focusing on the empirical reaction of the stock price to corrective disclosure, as described below.

**Company Statements Confirm the Materiality of the Allegations**

31.    The Company has acknowledged that material weaknesses in Avid's internal controls, and thus the problems of correctly recognizing revenue, could have material adverse effects on

---

[33] Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2011, filed 29 February 2012, p. 49.

the Company's value. Further, the Company acknowledged that these problems "could negatively impact [its] stock price," stating:

"We have identified control deficiencies that individually and when aggregated represent **material weaknesses in our internal control over financial reporting** and have concluded that our internal control over financial reporting and our disclosure controls and procedures were not effective as of December 31, 2013. If we fail to properly remediate these or any future weaknesses or deficiencies or maintain proper and effective internal controls, **our ability to produce accurate and timely financial statements could be impaired and our reputation could be harmed, which could negatively impact our stock price and damage our business**.

We have concluded that our internal control over financial reporting was not effective as of December 31, 2013 due to the **existence of material weaknesses in such controls,** and we have also concluded that our disclosure controls and procedures were not effective as of December 31, 2013 **due to material weaknesses in our internal control over financial reporting**. In the second quarter of 2013, **we determined that we needed to restate revenue for millions of customer transactions for interim and annual periods ended during the periods from January 1, 2005 to September 30, 2012 (the Restatement Periods) to correct errors in our historically issued financial statements**. In addition, **certain other adjustments arose in the Restatement Periods that were deemed material** and were adjusted in the restated financial statements for the Restatement Periods. The errors in the misapplication of GAAP over revenue recognition and the other errors identified resulted from several control deficiencies that were in existence during the Restatement Periods and at December 31, 2013, as described in Part II, Item 9A, "Controls and Procedures," of this Annual Report on Form 10-K."
**Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 11. (Emphasis added.)**

"Our identification of this additional undelivered element in substantially all of our customer arrangements **has a significant impact on our historical revenue recognition policies** because this element had not been previously accounted for in any period."[34]

---

[34] "The failure to identify and account for the existence of Implied Maintenance Release PCS resulted in errors in the timing of revenue recognition reported in the Company's previously issued consolidated financial statements. Historically, the Company generally recognized revenue upon product shipment or over the period services and post-contract customer support were provided (assuming other revenue recognition conditions were met). As described more fully in the Company's policy for 'Revenue Recognition' in Note A, the existence of Implied Maintenance Release PCS in a customer arrangement requires recognition of some or all arrangement consideration, depending on GAAP applicable to the deliverables, over the period of time that the Implied Maintenance Release

**Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. v. (Emphasis added.)**

"As a result of **the change in accounting standards**, even with consistent or increasing aggregate order values, **we will experience significant declines in revenues, deferred revenues and revenue backlog** in the coming years as revenue backlog associated with transactions occurring prior to January 1, 2011 decreases each quarter without being replaced by comparable revenue backlog from new transactions."
**Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 34.  (Emphasis added.)**


**Analyst Commentary and Concerns Indicate that the Subject Matter of Plaintiffs' Allegations Constituted Important Valuation-Relevant Information.**

32.  The following is a sample of quotes from analysts during the Class Period highlighting the critical importance of the timely and accurate reporting of the levels and growth rates of revenues and earnings:

"On the other hand, revenue growth still alludes [sic] you and it's going to be fairly modest next year. And yet, there's a lot of very positive drivers for the media creation industry. Gary, I wonder if you can help us understand why it is that top line growth is still proving so difficult to achieve."
**"AVID - Q4 2011 Avid Technology, Inc. Earnings Conference Call,"** *Thomson StreetEvents*, **7 February 2012, p. 9.**

"…we are not looking for robust growth at Avid, believing instead the turnaround story rests on low-single-digit top-line growth combined with a march to double-digit operating margins. If there's a major risk to the story, it would be a scenario where revenue declined steeply and the company would have to come up with additional cost savings."
**"Analyst Meeting Makes The Case For Material Margin Improvement," by Steven B. Frankel, Canaccord Adams, analyst report, 28 October 2008, p. 3.**

"While we view management's efforts to reduce expenses and streamline operation as impressive, we are primarily concerned about its revenue."
**"4Q Revenue Inline With Our Forecast, But Below Consensus; Management Continues To Cut Expenses, But More Cuts Are Needed; Maintain Hold Rating;**

---

PCS is delivered, which is after product delivery or services are rendered and is generally several years. The errors in the timing of revenue recognition have been corrected in the restated consolidated financial statements. The significant change in the pattern of revenue recognition also had indirect impacts on revenue related accounts, such as sales return allowances and, as discussed further below, non-revenue accounts such as goodwill, stock-based compensation and income taxes, which have also been restated in the restated consolidated financial statements."
Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014, p. 75.

Withdrawing $13PT," by Mark Harding, Maxim Group, analyst report, 30 January 2009, p. 2.

"Our December 2009 price target of $11.00 is based on our CY10 PF EPS estimate of $0.72 and a multiple of 15 times."
**"Adjusting Estimates on Mixed 1Q09 Results," by Paul Coster and Mark Strouse, JPMorgan, analyst report, 24 April 2009, p. 2.**

"While 4Q showed modest improvements in revenue in both the video and audio segments, the lower-than-expected EPS, albeit due to what management classified as seasonal increases in expenses, gives us pause."
**"Better-than-expected 4Q revenue; EPS missed due to seasonal factors and revenue mix-shift; Cost reductions on track; Improving 2010 outlook; Raising 2010 EPS estimates; Maintain Hold rating pending visibility of revenue growth," by Max Harding, Maxim Group, analyst report, 29 January 2010, p. 1.**

"Our 2011 Price Target goes to $17.50 based on a revised assigned multiple of 20 times CY12 PF EPS of $0.88."
**"Rewind and Play Again: Upgrading to Neutral," by Paul Coster, et al., JPMorgan, analyst report, 17 November 2010, p. 2.**

"Our price target is $25.00, based on 21 times CY12E PF EPS of $1.19."
**"1Q11 Preview: Positive Sentiment Post NAB," by Paul Coster, et al., JPMorgan, analyst report, 15 April 2011, p. 2.**

"Avid trades at just 4.7x EV/2013E EBITDA, while our Digital Media Group trades at 9.7x but without visibility into the path toward sustainable revenue growth and materially higher margins, the valuation is likely to remain depressed."
**"Still Struggling," by Steven B. Frankel, Dougherty and Company, LLC., analyst report, 21 February 2013, p.1.**

33.   Analyst commentary and concerns indicate that the subject matter of the Plaintiffs' allegations related to material weaknesses in internal controls were also important, value-relevant information.  These concerns not only relate to the ability of analysts to accurately forecast the financial performance of the Company, but also to the risks in their forecasts based on their confidence in the Company's internal controls.  Two samples of analyst's commentary – one before and one after the initial corrective disclosure in February 2013 – highlight the critical importance of internal controls:

"Accounting/Auditor: In Oct-09, AVID disclosed its audit committee was overseeing an investigation concerning the manner in which revenue was recognized on certain shipments of audio products near the end of

previous quarters from certain warehouses outside the United States. Based on preliminary results of the investigation, the company determined that it had, in certain instances, erroneously recognized revenue prior to transfer of title and risk of loss to customers. AVID recorded the estimated errors related to this matter in the financial statements for the three and nine month periods ended 30-Sep-09 prior to issuance of those financial statements. The company completed its investigation during 4Q09 and determined that no changes to previously filed financial statements were deemed necessary. During the course of the investigation, AVID delayed filing its 3Q09 and reported ineffective internal controls as of 30-Sep-09 due to a material weaknesses in the design and operating effectiveness of its controls and procedures in Europe relating to ensuring that revenue is recognized only after transfer of title and risk of loss to the customer. The material weakness was remediated and internal controls were reported effective as of 31-Dec-09. Since 2006, AVID has recorded $82 million of restructuring and other costs (net) and $183 million in charges of impairment of goodwill and intangible assets. Ernst & Young has been the company's auditor since Mar-06."

**"D.I. Report: Avid Technology," Disclosure Insight Report, 14 September 2011, pp. 1-2.**

"AVID's path back to growth, profitability and timely filing of quarterly financials remains uncertain. … We are cutting estimates to reflect this transition, and lowering our Price Target to $6.50. We are also downgrading the stock to Neutral. … **Filing process could take time**. The CFO would not be drawn on the time-line for completing the review of historical accounting records (audited and unaudited, going back ~5 years) needed to reconstruct revenue recognition for software sales (largely in the Audio segment). Our sense is that the firm will incur near-term G&A expense associated with this process. We do not expect the review to lead to major revision to cash-balance at the firm."

**"Fast Forward: Trimming Estimates, Downgrading to Neutral; Price Target to $6.50," by Paul Coster, JPMorgan analyst report, 1 July 2013 at p. 1. (Emphasis in original)**

34.    In addition, because of the Company's inability to provide timely financial information after the 25 February 2013 disclosure, analysts were no longer able to provide commentary and coverage on Avid.  Various analysts stated:

"We are discontinuing coverage of Avid Technology due to a realignment of analyst resources."

**"Discontinuing Coverage" by Michael J. Olson & Ryan J. Wright, Piper Jaffray, analyst report 22 July 2013.**

"We are terminating coverage of Avid Technology (AVID). Our last rating on the stock was Neutral ($5.46, 26 August). Effective upon termination of coverage, the last research issued for this stock should not be relied upon going forward."

**"Terminating Coverage" by Paul Coster, J. P. Morgan, analyst report, 27 August 2013.**

**"Investment Conclusion:**
The lack of current financials makes it impossible to form an investment opinion so we are suspending coverage of Avid Technology. We may consider returning the company to active coverage once the company's financials become current.

**Key Points:**
- Since the fourth quarter of last year, Avid has been in a protracted restatement of its financials stretching back to 2009. The restatement was triggered by the treatment of certain large contracts which now appear should have been recognized ratably rather that up-front.
- Earlier this week the company announced it was switching auditors, from Ernst & Young to Deloitte & Touche. The company also disclosed that it does not believe the restatements will be completed in time to meet the NASDAQ's March 14, 2014 deadline. Missing the deadline means the shares are likely to be delisted.
- The company disclosed that as of December 31st, its cash balance was $48M and there is no debt nor drawn down of the line of credit.
- Lacking reliable financials and facing the prospect of delisting, we are suspending coverage of Avid Technology. Our last published rating was Neutral."

**"Suspending Coverage Due to Continued Lack of Current Financials," by Steven B. Frankel, Dougherty and Company, LLC., analyst report, 10 January 2014.**

## Financial Principles Confirm the Materiality of the Allegations

35. That the provision of timely and accurate information is an important determinant of the value of a company's securities, is a fundamental financial principle that is well-established in the finance literature.

36. Kothari, Li and Short [2009], and Cheng, Collins and Huang [2006] explain how proper and timely information disclosure by management reduces risk, lowers the cost of capital for a company, and increases the value of the company's securities.

"The consensus among financial economists is that a rich disclosure environment and low information asymmetry have many desirable consequences. These include the efficient allocation of resources in an economy, capital market development, liquidity in the market, decreased cost of capital, lower return volatility, and high analyst forecast accuracy."

**"The Effect of Disclosures by Management, Analysts, and Business Press on Cost of Capital, Return Volatility, and Analyst Forecasts: A Study Using Content Analysis" by S.P. Kothari, Xu Li, and James E. Short, *The Accounting Review,* 2009, p. 1640.**

"Disclosures (*i.e.* information) enable investors to reduce the degree of error in estimating the parameters, which lowers a firm's cost of capital."
**"The Effect of Disclosures by Management, Analysts, and Business Press on Cost of Capital, Return Volatility, and Analyst Forecasts: A Study Using Content Analysis" by S.P. Kothari, Xu Li, and James E. Short, *The Accounting Review,* 2009, p. 1645.**

"First, confirming prior research we find that stronger shareholder rights and increased financial transparency/disclosure in the post-Enron era are jointly associated with significantly lower costs of equity capital."
**"Shareholder Rights, Financial Disclosure and the Cost of Equity Capital," by C. S. Agnes Cheng, Denton Collins, and Henry He Huang, *Review of Quantitative Finance and Accounting*, 2006, p. 200.**

37. Fung [2014] describes the importance of transparent and timely information to investors:

"Disclosure of reliable, timely information contributes to liquid and efficient markets by enabling investors to make investment decisions based on all of the available information that would be material to their decisions. As a result, investors are demanding better reporting and greater transparency."
**"The Demand and Need for Transparency and Disclosure in Corporate Governance," by Benjamin Fung, *Universal Journal of Management*, 2014, p. 76.**

38. Clearly, the financial academic literature explains that the timely and accurate disclosure of information is important to investors and materially affects company value. Avid's inability to provide timely and accurate reporting, because of the material weaknesses in the Company's internal controls, and thus the problems of correctly recognizing revenue, undoubtedly would have affected the market's assessment of the Company's value and the value of Avid stock during the Class Period had these deficiencies been disclosed to the market.

## Reputation Effect and Negative Valuation Impact of Restatements

39. Generally accepted principles of valuation dictate that earnings, profitability, the reliability of accounting data, and management reputation are important factors that bear on the valuation of a company's stock. Company statements, analyst commentary, and the models

analysts used during the Class period to value Avid stock acknowledge and confirm these facts. The event study proves the conclusion empirically.

40.   It is well-established in the finance literature that the ramifications of financial fraud extend well beyond the direct dollar amount of the fraud, but also causes further loss on account of damage to a company's reputation. This principle is generally accepted and presented in the academic and professional literature. For example:

> "Risk/uncertainty likely increases and future prospects may well decrease when management integrity and competence are called into question.
> …
> Because fraud means intentional, non-GAAP financial reporting, it indicates a lack of management integrity that we expect to be associated with a more negative stock price reaction, incremental to any other impacts from revising reported results. This may be due to an increase in the discount rate because fraud creates uncertainty about the reliability and credibility of management representations, which increases the perceived information asymmetry between management and stockholders.
> …
> Our results suggest a greater investor concern over restatements that carry negative implications for management integrity than those due to more technical issues."
> **"Determinants of Market Reactions to Restatement Announcements," by Zoe-Vonna Palmrose, Vernon J. Richardson, and Susan Scholz, *Journal of Accounting & Economics*, 2004.**

41.   Karpoff, Lee, and Martin [2008] find that "for each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional \$2.71, due to reputation loss."[35]

> "Reputation can be lost if customers change the terms on which they are willing to do business with the firm because of an increased probability of cheating or the perception that the firm cannot support warranties or supply compatible parts in the future. Diminished reputation also can reflect an increase in the firm's cost of capital or trade credit, as input suppliers change the terms with which they do business with the firm. In addition, the firm can suffer real losses as managers are required to divert resources to the investigation and away from company business. The revelation of financial reporting problems could also force the firm to implement new monitoring and control policies, increasing the cost of

---

[35] The Cost to Firms of Cooking the Books," by Jonathan Karpoff, D. Scott Lee, and Gerald Martin, Journal of Financial and Quantitative Analysis, 2008, p. 581.

operations. We group all such real effects on firm value into the reputation
loss."

**"The Cost to Firms of Cooking the Books," by Jonathan M. Karpoff, D. Scott Lee,
and Gerald S. Martin,** *Journal of Financial and Quantitative Analysis*, **2008, pp. 598-
99.**

42.   In this case, beyond any direct valuation impact of Avid's misstated revenues and earnings,
      the Company's stock would have been artificially inflated over the course of the Class
      Period due to the reputation effect. The alleged deficiencies, misrepresentations, and
      omissions that eventually impaired management's reputation were concealed until the
      corrective disclosure in February 2013. According to the published literature, all or a
      portion of the decline in stock price following such a corrective disclosures may be
      attributable to a loss of reputation.

## EMPIRICAL CONFIRMATION OF LOSS CAUSATION

43.   Over the course of the Class Period, the alleged misrepresentations, omissions and
      deceptive conduct caused the price of Avid stock to be artificially inflated.  When the truth
      about the condition of the Company's internal controls, revenue recognition, and
      accounting misstatements emerged, the artificial inflation dissipated, causing the stock
      price to decline and investors to suffer losses.

44.   These conclusions, compelled by financial valuation principles, Company statements, and
      analyst commentary, are also proved empirically by event study analysis focusing on the
      reaction of the Avid stock price to the corrective disclosure.

### Event Study

45.   An event study examines whether a security price reacts to the release of new information.
      A statistically significant stock price reaction in response to the release of new information
      indicates that the new information caused the price change.

46.   Event study analysis is one of the most commonly used analytic methodologies employed
      by finance researchers.  MacKinlay [1997] presents a description and examples of the
      methodology and writes about how it is generally accepted and widely used in academic

research.[36]  Tabak and Dunbar [2001] have also written about how the methodology is generally accepted and widely used in forensic applications.[37]

47.  An event study first determines how much of a stock price change cannot be explained by market and sector factors.  The portion of a stock price change that cannot be attributted to market and sector factors is called the "residual" stock price movement or "residual return."  The event study isolates the residual return and also tests whether or not the residual return can reasonably be explained as merely a random fluctuation.

48.  If the stock return is deemed statistically significant, it indicates that the stock price movement cannot be attributed to market and sector factors, or to random volatility, but rather was caused by new company-specific information.

## Disclosure Event

49.  I reviewed a wide variety of information sources, including news articles, press releases, equity analyst reports, and SEC filings in order to determine when corrective information related to the alleged misrepresentations and omissions was disseminated.  I determine that the 25 February 2013 announcement was a corrective disclosure event meeting this criterion and was largely devoid of confounding information.[38]

## Isolating the Impact of Company-Specific Information

50.  An event study determines how much of a company's stock returns are attributable to market and sector effects, so that these factors can be isolated and removed.

51.  The method, which is generally accepted and widely used in econometric modeling, first involves running a regression to determine how the company's stock price typically

---

[36] "Event Studies in Economics and Finance," A. Craig MacKinlay, *Journal of Economic Literature*, March 1997.

[37] "Materiality and Magnitude:  Event Studies in the Courtroom," by David Tabak and Frederick Dunbar, in *Litigation Services Handbook*, 3rd edition, John Wiley & Sons, New York, 2001.

[38] There are two additional disclosure dates listed in the Complaint (¶¶141-143) with alleged corrective disclosures of how the Company had improperly recognized revenue from Software Updates and the impact and implications of the forthcoming restatement with respect to revenue recognition. These dates are 19 March 2013 and 21 March 2013.  The first of these dates was included in the Feinstein Report in my analysis of market efficiency. I do not include either of these dates in the present analysis because the observed stock price declines were not statistically significant based on the event study described below.  With limited discovery to date I reserve my right to supplement this report if information becomes available that enables me to separate the price impact of the various factors on these dates. Therefore, in this report, for the price declines on those two dates I do not ascribe any artificial inflation related directly to the material weaknesses in Avid's internal controls and thus the problems of correctly recognizing revenue.

behaved in relation to the overall stock market and its industry sector.  The portion of the event day's actual return that is explained by the market and sector factors is call the "explained return".  The actual return minus the explained return is the residual return.

52.    In this case, the regression analysis removed from the returns of Avid stock that portion explained by the overall stock market[39] and the Company's peers,[40] thereby isolating Avid residual returns.

53.    I used the regression model described in paragraphs 103-116 and results presented in Exhibit-6 of the Feinstein Report to compute the residual returns in Avid stock.

54.    I computed the explained portion of Avid's stock return on the event date by adding:  (1) the estimated regression intercept term, (2) the day's Market Index return multiplied by the Market Index coefficient estimated by the regression, and (3) the day's Peer Index return multiplied by the regression's Peer Index coefficient.

55.    I then computed the residual return for the event date by subtracting that day's explained return from the actual return.

*t*-test

56.    For the event on 25 February 2013, a statistical test called a *t*-test was conducted to determine whether the residual return of Avid's stock can be explained by random volatility, or alternatively must have been caused by Company-specific information.  A *t*-test compares the residual return on an event date to the typical residual return exhibited over the estimation period.  If the event date residual return is far larger (positively or negatively) than the typical residual return, the *t*-test indicates that the residual return in

---

[39] For the overall stock market factor I used the CRSP Market Total Return Index ("Market Index"), which is a generally accepted and widely used measure of the overall stock market performance.

[40] For the peer group factor, I used the same group of companies that Avid identified as its peers. In its annual 10-K statement for the fiscal year ended 31 December 2011, Avid compared its performance to a Company-selected peer group composed of seven companies. The seven companies identified as peers by Avid were: Cadence Design Systems, Mentor Graphics Corporation, National Instruments Corporation, Harmonic Inc., Imation Corporation, AutoDesk Inc., and Dolby Laboratories Inc. (Avid Technology, Inc., Form 10-K for the fiscal year ended 31 December 2011, filed 29 February 2012, p. 20.)  I constructed a peer group index ("Peer Index") from the prices and returns of these seven companies to measure the daily performance of Avid's peer group, as the Company itself identified these companies as the appropriate peer group. In accordance with generally accepted practice, I constructed a value-weighted index of the constituent companies. Each trading day's return for the Peer Index is the value-weighted average of the constituent company returns, inclusive of dividends.

question cannot have been caused by random volatility alone – *i.e.*, it is statistically significant.[41]

**Event Study Analysis: 25 February 2013**

57.  On 25 February 2013, Avid issued a press release stating that it was "postponing its fourth quarter 2012 earnings release and investor conference call, previously scheduled for Tuesday, February 26, 2013 to provide additional time for the Company to evaluate its current and historical accounting treatment related to bug fixes, upgrades and enhancements to certain products."[42]

58.  On that day, Avid common stock fell 9.30% (on a logarithmic basis).  The Market Index return was -1.76% and the Peer Index return was -2.28%.  The explained return was -2.04%, and the residual return amounted to -7.25%, or $0.54 per share.

59.  A residual return of -7.25%, is an unusually large negative one-day return for Avid common stock.  That residual return is associated with a *t*-statistic value of -3.67, which indicates that the residual return was too severe to have been a random fluctuation. Therefore, the stock return is deemed statistically significant.

60.  A *t*-statistic this extreme enables one to conclude with more than 99.97% confidence that the Avid stock decline was caused by the Company-specific news.

**Accounting for Potentially Confounding Information**

61.  The information in the Company press release, the press coverage, and analyst reports do not suggest that there are any confounding factors.

62.  News reports linked the immediate decline in the Company's share price to the adverse accounting news. For example:

> "Shares of Avid Technology Inc. tumbled after the company said it was indefinitely postponing a quarterly earnings announcement while it evaluates its accounting. Avid Technology had been scheduled to release

---

[41] The test is called the *t*-test because it involves the computation of a *t*-statistic, which is the event date residual return divided by the standard deviation of residual returns from the estimation period.  If the absolute value of the *t*-statistic is greater than the critical *t*-statistic value (1.96 for large samples), the likelihood that the residual return could have been caused by random volatility alone is less than 5%, which is generally accepted to be so unlikely that the random volatility explanation can be rejected.

[42] "Avid Postpones its Fourth Quarter Earnings Release," *Business Wire*, Company press release, 25 February 2013, 8:10 AM.

fourth-quarter earnings on Tuesday and hold a conference call for investors. The Burlington, Mass.-based company said on Monday that it is postponing the announcement but is unable to estimate when its accounting evaluation will be completed."

**"Avid Technology Shares Tumble As Company Postpones Earnings Release, Citing Accounting Issue,"** *Associated Press*, **25 February 2013, 12:20 PM.**

63.    Thus, the event study analysis proves that Avid's stock price declined significantly in response to the disclosure event.  Analysis of the information disseminated, including an accounting for potentially confounding information, proves that disclosure of the material weaknesses in the internal controls and thus the problems correctly recognizing revenue and their implications caused the stock price to fall on 25 February 2013.

## ARTIFICIAL INFLATION RIBBON

64.    An inflation ribbon is a time series indicating how much artificial inflation caused by the alleged fraud was in the stock price on each day of the Class Period.  The inflation ribbon is constructed by analyzing the stock price changes that were caused by the allegation-related information as indicated by the event study and analysis of the information that transpired on an event date.  When the stock price falls on account of a corrective disclosure, inflation dissipates. Inflation after such a corrective disclosure and significant price movement must be less than the inflation prior to the disclosure.

65.    Experts in securities litigation have used three approaches to measure stock price inflation ribbons.  These include: (a) the index method where it is assumed that "from the first misrepresentation through the final correction, the true value of the stock would have moved in the same proportion as a selected index;"[43] (b) the constant percentage method which "presumes that the percent of the stock price that is accounted for by inflation does not vary when there are no additional misrepresentations or corrective disclosures;"[44] and (c) the constant dollar method which "assumes that the dollar drop at the end of the class period represents the amount of inflation in the stock price since the previous

---

[43] "Inflation and Damages in a Post-Dura World," David Tabak, NERA Economic Consulting White Paper, 25 September 2007, p 2.
[44] "Inflation and Damages in a Post-Dura World," David Tabak, NERA Economic Consulting White Paper, 25 September 2007, p 2.

misrepresentation or corrective disclosure."[45]  All three of these approaches assume that after the final corrective disclosure all price inflation has dissipated and the stock price correctly reflects its true value.

66.   Choosing the appropriate method depends on the nature of the misrepresentations and/or omissions, although based on the *Dura Pharmaceuticals* decision, the courts restrict "damages to which an investor is entitled are the actual price declines that occurred in response to corrective disclosures that occurred while the investor was holding the stock. The investor is not compensated for the effects of any market- or nonfraud-related factors that lowered the value of her investment on days other than those with corrective disclosures."[46]

### Reduction of Inflation on 25 February 2013 Due to Disclosure of Material Weaknesses in the Internal Controls and Thus the Problems of Correctly Recognizing Revenue

67.   Based on the aforementioned analysis, artificial inflation associated with material weaknesses in the internal controls, and thus the problems correctly recognizing revenue at the start of the Class Period, was $0.54 per share and remained constant until just prior to the corrective disclosure on 25 February 2013. After the corrective disclosure artificial inflation was reduced by $0.54.

68.   The inflation in Avid's stock price was constant over the course of the Class Period.  The facts of this case and the specifics of the accounting restatements compel a conclusion that the stock decline on 25 February 2013 represented the diminution of value stemming from the market's new understanding that the Company suffered from material weaknesses in internal controls relating to accounting and reporting stemming back to the beginning of the Class Period. Consequently, the inflation in the stock price observed on the corrective disclosure date appropriately measures the artificial inflation in the stock price throughout the Class Period.

69.   The nature of the disclosure would have resulted in the same dollar impact on the stock price no matter when it would have occurred during the Class Period.

---

[45] "Inflation and Damages in a Post-Dura World," David Tabak, NERA Economic Consulting White Paper, 25 September 2007, p 3.
[46] "Inflation and Damages in a Post-Dura World," David Tabak, NERA Economic Consulting White Paper, 25 September 2007, p 9.

## PER SHARE DAMAGE FORMULA

70.   The measure of per share damages traditionally applied in 10b-5 cases is the difference between the actual purchase price of the security and what would have been the purchase price of the security had there been no fraud or misrepresentation.

> "[M]any courts have adopted the out-of-pocket rule as the traditional measure of damages in Rule 10b-5 cases.  The out-of-pocket measure rule defines damages as 'the difference between the contract price, or the price paid, and the real or actual value at the date of the sale, together with such outlays as are attributable to the defendant's conduct. Or, in other words, the difference between the amount parted with and the value of the thing received.' Typically, courts measure this as the plaintiff's purchase price less the true value at the time of the transaction. The true value is the price of the security in the absence of fraud or misrepresentation."
> **"Federal Securities Acts and Areas of Expert Analysis," by Nicholas I. Crew, Kevin L. Gold, and Marnie A. Moore, chapter 18 in *Litigation Services Handbook: The Role of the Financial Expert*, 4th edition, edited by Roman Weil, Peter Frank, Christian Hughes, and Michael J. Wagner, John Wiley & Sons, 2007,  p. 18.6 (internal citations omitted).**

71.   However, the *Dura Pharmaceuticals* case decision clarified that recoverable damages are not the entire amount by which an investor overpaid for a security on account of fraud, but how much of that artificial inflation was actually lost by the investor on account of corrective disclosures that occurred during the investor's holding period.  Therefore, recoverable damages are equal to the amount by which fraud-induced inflation decreased between the time the investor purchased and sold the security.

72.   For shares sold after the final corrective disclosure, the Private Securities Litigation Reform Act of 1995 ("PSLRA 1995") limits the recoverable damages to no greater than the difference between the price paid for the security and the average trading price over the 90 days subsequent to the disclosure (the "bounce-back period").

> "[T]he award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."
> **15 U.S.C. § 78u-4(e) (1).**

73.  Damage on any share purchased during the Class Period and held 90 days or more beyond the final corrective disclosure equals the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the stock price (the investment loss), where the terminal stock price is deemed to be the average price over the 90 days following the final corrective disclosure.

74.  Because the final disclosure in this case took place on 25 February 2013, the 90-day bounce-back period stretches from 26 February 2013 to 24 May 2013 (the last trading day within the 90 calendar days following the disclosure).[47] The average price for Avid stock over this period of 90 calendar days, based on daily closing prices, was $6.67 per share. Avid stock prices and trading volume are shown in Exhibit-3.

75.  According to the PSLRA, the investment loss cap for a share sold *within* the 90-day bounce-back period is a function of the average trading price from the date of final disclosure to the date of actual sale.

> "[I]f the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security."
> **15 U.S.C. §78u-4(e) (2).**

76.  Thus, the damages for any share purchased during the Class Period and sold up to 90 days after the final corrective disclosure is the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the stock price (the investment loss), where the sale price is computed to be the average trading price from the final corrective disclosure date to the sale date.  That is, the damage is capped by the investment loss where the actual sale price is replaced by the average price within the 90-day bounce-back period up to the date of actual sale.

77.  To provide a conservative measure of damages, I applied the PSLRA investment loss cap to shares sold *during* the Class Period as well as to shares sold afterward. For any particular

---

[47] 26 May 2013 is a Sunday, so the bounce back period ends on 24 May 2013.

holding period, I computed damages as the lesser of the decline in the inflation ribbon (based on the out-of-pocket measure as limited by *Dura*) and the decline in the share price over the holding period (based on the PSLRA investment loss cap).

78. As an example of how per share damages are computed for a particular investor, consider an investor who purchased Avid stock on 27 December 2011 for $8.97 per share and sold those shares at the close of trading on 25 March 2013 for $6.70 per share. The inflation at the close of trading on 25 February 2013 had been reduced by $0.54 per share. Based on the change in inflation, this investor's economic/inflation loss is $0.54 per share, equal to the decline in inflation over his holding period. The investment loss is $2.27 per share, equal to the $8.97 purchase price minus the $6.70 per share sale price. The per share damages are the lesser of the economic/inflation loss and the investment loss, which is $0.54 per share.

79. Based on the foregoing analysis and statutory formulas, Rule 10b-5 damages per share range from $0 to $0.54 per share, excluding prejudgment interest.  A particular investor's damages depend on when during the Class Period each share was purchased, as well as if and when each respective share was subsequently sold.

## LIMITING FACTORS AND OTHER ASSUMPTIONS

80. This declaration is furnished solely for the purpose of court proceedings in the above referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report, including in the event additional information becomes available.

_____
Steven P.  Feinstein, Ph.D., CFA

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon
In Addition to my September Report**


**CASE DOCUMENTS**

- Feinstein Report, dated 15 September 2014.
- Second Amended Complaint, dated 24 September 2014.


**ANALYST REPORTS**

- Canaccord Adams, 28 October 2008.
- Maxim Group, 30 January 2009.
- JPMorgan, 24 April 2009.
- Maxim Group, 29 January 2010.
- JPMorgan, 17 November 2010.
- JPMorgan, 15 April 2011.
- Dougherty and Co., LLC, 21 February 2013.
- Disclosure Insight Report, 14 September 2011.
- JPMorgan, 1 July 2013.
- Piper Jaffray, 22 July 2013.
- JPMorgan, 27 August 2013.
- Dougherty and Co., LLC, 10 January 2014.


**SEC FILINGS**

- Avid Technology, Inc. Form 10-K for the Fiscal Year Ended 31 December 2013, filed 12 September 2014.


**ACADEMIC AND PROFESSIONAL LITERATURE**

- Agnes, C.S., et al., "Shareholder Rights, Financial Disclosure and the Cost of Equity Capital," *Review of Quantitative Finance and Accounting*, 2006.
- Crew, Nicholas I., et al., "Federal Securities Acts and Areas of Expert Analysis," chapter 18 in *Litigation Services Handbook: The Role of the Financial Expert*, 4th edition, edited by Roman Weil, Peter Frank, Christian Hughes, and Michael J. Wagner, John Wiley & Sons, 2007.
- Fung, Benjamin, "The Demand and Need for Transparency and Disclosure in Corporate Governance," *Universal Journal of Management*, 2014.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon
In Addition to my September Report**

- Karpoff, Jonathan M., et al., "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis*, 2008.
- Kothari, S.P, et al., "The Effect of Disclosures by Management, Analysts, and Business Press on Cost of Capital, Return Volatility, and Analyst Forecasts: A Study Using Content Analysis," *The Accounting Review,* 2009.
- Palmrose, Zoe-Vonna, et al., "Determinants of Market Reactions to Restatement Announcements," *Journal of Accounting & Economics*, 2004.
- Tabak, David, "Inflation and Damages in a Post-Dura World," NERA Economic Consulting White Paper, 25 September 2007.

**OTHER**

- Any other documents and data cited in the report.

**Exhibit-2**
**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided Since my September Report**


Mary K. Jones, *et al*., vs. Pfizer Inc., *et al.*
United States District Court
Southern District of New York
Civil Action no. 10-CV-03864-AKH
Deposition Testimony
January 2012 and October 2014

In Re Questcor Pharmaceuticals, Inc. Securities Litigation
Civil Action No. 12-cv-01623-DMG
United States District Court
Central District of California
Deposition Testimony
October 2014

**Exhibit-3**

**Avid Technology, Inc. (AVID) 90 Day Bounce-Back Period
Stock Prices and Volumes**

26 February 2013 to 24 May 2013

| Date | AVID Closing Price | AVID Trading Volume |
|---|---|---|
| 2/26/2013 | $6.90 | 260,967 |
| 2/27/2013 | $6.85 | 198,500 |
| 2/28/2013 | $6.93 | 129,040 |
| 3/1/2013 | $6.70 | 198,549 |
| 3/4/2013 | $6.69 | 102,116 |
| 3/5/2013 | $6.54 | 152,309 |
| 3/6/2013 | $6.72 | 105,910 |
| 3/7/2013 | $6.72 | 80,843 |
| 3/8/2013 | $6.85 | 173,087 |
| 3/11/2013 | $6.95 | 131,521 |
| 3/12/2013 | $6.96 | 105,384 |
| 3/13/2013 | $6.98 | 75,193 |
| 3/14/2013 | $6.91 | 147,662 |
| 3/15/2013 | $6.99 | 268,212 |
| 3/18/2013 | $6.96 | 67,992 |
| 3/19/2013 | $6.85 | 93,139 |
| 3/20/2013 | $6.94 | 68,840 |
| 3/21/2013 | $6.82 | 58,473 |
| 3/22/2013 | $6.56 | 112,241 |
| 3/25/2013 | $6.70 | 89,240 |
| 3/26/2013 | $6.68 | 91,007 |
| 3/27/2013 | $6.40 | 134,434 |
| 3/28/2013 | $6.27 | 174,729 |
| 4/1/2013 | $6.47 | 160,586 |
| 4/2/2013 | $6.84 | 147,010 |
| 4/3/2013 | $6.24 | 148,144 |
| 4/4/2013 | $6.18 | 98,311 |
| 4/5/2013 | $6.25 | 61,431 |
| 4/8/2013 | $6.19 | 54,828 |
| 4/9/2013 | $6.21 | 92,811 |
| 4/10/2013 | $6.51 | 210,828 |
| 4/11/2013 | $6.49 | 65,005 |
| 4/12/2013 | $6.37 | 65,948 |
| 4/15/2013 | $6.17 | 102,443 |
| 4/16/2013 | $6.18 | 77,966 |

**Exhibit-3**

**Avid Technology, Inc. (AVID) 90 Day Bounce-Back Period
Stock Prices and Volumes**

26 February 2013 to 24 May 2013

| Date | AVID Closing Price | AVID Trading Volume |
|---|---|---|
| 4/17/2013 | $6.02 | 131,506 |
| 4/18/2013 | $6.19 | 95,908 |
| 4/19/2013 | $6.28 | 108,908 |
| 4/22/2013 | $6.31 | 87,046 |
| 4/23/2013 | $6.48 | 41,764 |
| 4/24/2013 | $6.69 | 52,397 |
| 4/25/2013 | $6.75 | 36,094 |
| 4/26/2013 | $6.76 | 139,416 |
| 4/29/2013 | $6.71 | 60,420 |
| 4/30/2013 | $6.59 | 85,437 |
| 5/1/2013 | $6.49 | 108,866 |
| 5/2/2013 | $6.86 | 77,276 |
| 5/3/2013 | $6.87 | 129,390 |
| 5/6/2013 | $6.86 | 32,142 |
| 5/7/2013 | $6.89 | 33,450 |
| 5/8/2013 | $6.94 | 41,969 |
| 5/9/2013 | $6.82 | 32,080 |
| 5/10/2013 | $6.91 | 64,041 |
| 5/13/2013 | $6.92 | 87,624 |
| 5/14/2013 | $6.89 | 77,739 |
| 5/15/2013 | $6.95 | 39,774 |
| 5/16/2013 | $6.99 | 277,636 |
| 5/17/2013 | $7.01 | 267,627 |
| 5/20/2013 | $6.93 | 81,887 |
| 5/21/2013 | $6.87 | 74,019 |
| 5/22/2013 | $6.82 | 98,484 |
| 5/23/2013 | $6.71 | 102,663 |
| 5/24/2013 | $6.81 | 23,095 |

**Source:** CRSP.